780 F.2d 267
 121 L.R.R.M. (BNA) 2121, 54 USLW 2379,
104 Lab.Cas. P 11,941,
RICO Bus.Disp.Guide 6132,
19 Fed. R. Evid. Serv. 944
 UNITED STATES of America
v.
LOCAL 560 OF the INTERNATIONAL BROTHERHOOD OF TEAMSTERS,
CHAUFFEURS, WAREHOUSEMEN, AND HELPERS OF AMERICA, Salvatore
Provenzano, President, Joseph Sheridan, Vice-President,
Josephine Provenzano Septembre, Sec-Treasurer, J.W. Dildine,
Recording Secretary, Thomas Reynolds, Sr., Trustee, Stanley
Jaronko, Trustee, Trucking Employees of North Jersey Welfare
Fund, Inc., Salvatore Provenzano, Employee Trustee, Thomas
Reynolds, Sr., Employee Trustee, Local 560 Officers and
Employees Severance Pay Plan, Salvatore Provenzano, Trustee
and Administrator, Josephine P. Septembre, Trustee and
Administrator, Anthony Provenzano, individually, Nunzio
Provenzano, individually, Stephen Andretta, individually,
Thomas Andretta, individually, Gabriel Briguglio, individually.
UNITED STATES of America
v.
LOCAL 560 OF the INTERNATIONAL BROTHERHOOD OF TEAMSTERS,
CHAUFFEURS, WAREHOUSEMEN, AND HELPERS OF AMERICA, Salvatore
Provenzano, President, Joseph Sheridan, Vice-President,
Josephine Provenzano Septembre, Sec-Treasurer, J.W. Dildine,
Recording Secretary, Thomas Reynolds, Sr., Trustee, Stanley
Jaronko, Trustee, Trucking Employees of North Jersey Welfare
Fund, Inc., Salvatore Provenzano, Employee Trustee, Thomas
Reynolds, Sr., Employee Trustee, Local 560 Officers and
Employees Severance Pay Plan, Salvatore Provenzano, Trustee
and Administrator, Josephine P. Septembre, Trustee and
Administrator, Anthony Provenzano, individually, Nunzio
Provenzano, individually, Stephen Andretta, individually,
Thomas Andretta, individually, Gabriel Briguglio, individually.
Appeal of LOCAL UNION NO. 560, Appellants.
Appeal of Salvatore PROVENZANO, Joseph Sheridan, Jay
Dildine, Josephine Provenzano, Thomas Reynolds,
Michael Sciarra and Stanley Jaronko, Appellants.
 Nos. 84-5333, 84-5334.
 United States Court of Appeals,
Third Circuit.
 Argued Feb. 12, 1985.
Decided Dec. 26, 1985.
Rehearing and Rehearing In Banc Denied Jan. 23, 1986.
As Amended Feb. 3, 1986.
 
 Harvey Weissbard (argued), Weissbard & Wiewiorka, West Orange, N.J., for appellants.
 Edward A. Cohen (argued), Schneider, Cohen & Solomon, Jersey City, N.J., for appellant Local Union No. 560.
 W.H. Dumont (argued), U.S. Atty., Ralph A. Jacobs, Chief, Appeals Div., Thomas L. Weisenbeck, Asst. U.S. Atty., Leopold Laufer, Sp. Atty., U.S. Dept. of Justice, Claudia J. Flynn, Victor Ashrafi, Faith S. Hochberg, Asst. U.S. Attys., Newark, N.J., for appellee.
 Before GARTH and BECKER, Circuit Judges, and ROSENN, Senior Circuit Judge.
 OPINION OF THE COURT
 GARTH, Circuit Judge:
 
 
 1
 This appeal culminates a lengthy and complex civil action brought pursuant to the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. Secs. 1961, et seq., by the United States against several defendants who allegedly acquired an interest in, and effectively dominated, Local 560 of the International Brotherhood of Teamsters ("Local 560"). The district court, concluding that Local 560 was a "captive labor organization," enjoined certain defendants from any future contacts with Local 560, and removed the current members of the Local 560 Executive Board, replacing the Executive Board with a temporary trusteeship until free elections could be held. The district court's opinion appears at 581 F.Supp. 279 (D.N.J.1984). The district court stayed its injunction pending appeal to this Court. We now affirm.
 
 I.
 
 2
 On March 9, 1982, the government filed its civil complaint naming as defendants twelve individuals, Local 560, and Local 560's Welfare Fund and Severance Pay Plan. The government alleged that five of the named defendants: Anthony Provenzano, Nunzio Provenzano, Steven Andretta, Thomas Andretta and Gabriel Briguglio, were members of an ongoing criminal confederation--the Provenzano Group[1]--which, through acts of extortion and murder, effectively acquired an interest in, and control of, Local 560, an enterprise within the meaning of RICO, in violation of 18 U.S.C. Sec. 1962(b).[2] The government also charged these defendants, as the Provenzano Group, with unlawfully participating, directly and indirectly, in the conduct of Local 560's affairs through a pattern of racketeering activity in violation of 18 U.S.C. Sec. 1962(c)[3] and with conspiring to violate the above two provisions of RICO (Secs. 1962(b) and (c)) in contravention of 18 U.S.C. Sec. 1962(d).[4]
 
 
 3
 Finally, the government charged the remaining seven individual defendants: Salvatore Provenzano, Joseph Sheridan, Josephine Provenzano, J.W. Dildine, Thomas Reynolds, Michael Sciarra, and Stanley Jaronko, who, at the time the suit was brought, constituted the Executive Board of Local 560, with aiding and abetting the Provenzano Group in violating 18 U.S.C. Sec. 1962(b) and (d).[5]
 
 
 4
 As stated above, the government avers that the Provenzano Group, aided and abetted by past and present members of the Executive Board of Local 560, violated 18 U.S.C. Sec. 1962(b) by acquiring an interest in and control of Local 560 through a pattern of racketeering activity. The Provenzano Group's racketeering activity, the government argues, consisted of various acts of murder and extortion, the extortion element consisting of:
 
 
 5
 the wrongful use of actual and threatened force, violence and fear of physical and economic injury in order to create within Local 560 a climate of intimidation which induced the members thereof to consent to the surrender of certain valuable property in the form of their union rights as guaranteed by the provisions of Sections 157 and 411 of Title 29 of the United States Code [the Taft-Hartley Act, 29 U.S.C. Sec. 157 and the Labor Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. Sec. 411].
 
 
 6
 App. at 174A. Specifically, paragraph 12(a) of the Complaint alleged that The Provenzano Group extorted the membership's rights to vote, speak, and assemble freely by systematic acts of intimidation, including, as the district court summarized:
 
 
 7
 (1) the June 1961 murder of Anthony Castellitto; (2) the August 1961 appointment of Salvatore Provenzano to the position of Trustee formerly occupied by Castellitto; (3) the September 1961 appointment of Salvatore Briguglio--the alleged murderer of Castellitto--to the position of Business Agent; (4) the February 1963 appointment of Nunzio Provenzano to the position of Business Agent following his January 1963 conviction for extortion; (5) the May 1963 murder of Walter Glockner; (6) the 1964 appointment of Robert A. Luizzi to the position of Business Agent in spite of a record of criminal convictions; (7) the May 1967 appointment of Luizzi to the position of Trustee; (8) the February 1969 appointment of Salvatore Briguglio to position of Business Agent following completion of a term of imprisonment for extortion; (9) the April 1969 appointment of Nunzio Provenzano to the position of clerk following completion of a term of imprisonment for extortion; (10) the 1970 appointment of Nunzio Provenzano to the position of Business Agent; (11) the 1971 appointment of Thomas Reynolds, Sr. to the position of Business Agent in spite of a record of criminal activity; (12) the 1972 appointment of Nunzio Provenzano to the position of Fund Trustee; (13) the 1972 appointment of Salvatore Briguglio to the position of Fund Trustee; (14) the allowance of frequent visitations by Armand Faugno and Thomas Andretta to the offices of Local 560; (15) the January 1963 appointment of Nunzio Provenzano to the position of Secretary-Treasurer; (16) the 1973 appointment of Reynolds to the position of Fund Trustee; (17) the 1974 resumption of duties as Business Agent by Salvatore Briguglio following completion of a term of imprisonment for counterfeiting; (18) the 1974 appointment of Luizzi to the position of Fund Trustee; (19) the November 1975 appointments of Anthony and Nunzio Provenzano to the positions of Secretary-Treasurer and President, respectively, in spite of a record of convictions for extortion; (20) the February 1977 appointment of Reynolds to the position of Trustee; (21) the July 1978 appointment of Josephine Provenzano to the position of Secretary-Treasurer following Anthony Provenzano's conviction for the Castellitto murder; (22) the July 1981 appointment of Salvatore Provenzano to the position of President following Nunzio Provenzano's forced resignation as a condition of bail on a labor racketeering conviction; (23) the Executive Board's failure to recover monies wrongfully converted by Anthony Provenzano; (24) the retention of Marvin Zalk as Fund Administrator in spite of payments accepted by him from an insurance company representative during the 1950's; (25) the retention of Ralph Torraco as the Fund's independent certified public accountant in spite of his federal indictment for systematically overbilling the Fund; (26) the extortion of contributions to the defense funds of the Provenzanos and Michael Sciarra from union members; (27) the 1981 appointment of Luizzi to the position of Business Agent; and (28) associations by some of the defendants with Frank "Funzi" Tieri and Matteo Alfredo Ianniello, reputed to be organized crime members.
 
 
 8
 App. at 10-12.
 
 
 9
 In addition to committing acts of murder and extortion for the purpose of dominating Local 560, the individual members of the Provenzano Group, according to the government's complaint, allegedly committed several other illegal acts in its participation in the conduct of the affairs of the Local 560 enterprise in violation of 18 U.S.C. Sec. 1962(c). The predicate illegal acts which comprised the Provenzano Group's "pattern of racketeering activity" under Sec. 1962(c) as alleged in the government's Complaint were summarized by the district court as follows:
 
 
 10
 (1) the extortion of $17,000 from Walter Dorn and his company (Dorn Transport, Inc. of Rensselaer, New York), in return for "labor peace"; (2) the wrongful conversion by defendant Anthony Provenzano, aided and abetted by successive defendant members of the Local 560 Executive Board, of approximately $223,785 in Local 560 funds "by means of false and fraudulent pretenses, representations, and promises, and pursuant to a scheme and artifice to defraud ...;" (3) the wrongful receipt by Provenzano Group members of payments, loans and other things of value from certain employers (Interocean Services, Inc. and Di-Jub Leasing, Inc.) in exchange for "labor peace"; (4) the unlawful receipt by defendant Anthony Provenzano, aided and abetted by Salvatore Briguglio, of certain fees, kickbacks, gifts or things of value in the form of certain Florida real estate because of, and with intent to be influenced with respect to, his actions and decisions relating to the Benefit Fund; and (5) the wrongful receipt by defendant Nunzio Provenzano, together with Irving Cotler and others, as associates of the Provenzano Group, of "labor peace" payments by certain employers, specifically Pacific Intermountain Express Company, Mason and Dixon Lines, Inc., T.I.M.E.--DC, Inc. and Helms Express.
 
 
 11
 App. at 13.
 
 
 12
 In its demand for relief, the government sought only injunctive and equitable remedies. The government asked that the district court (1) enjoin Anthony Provenzano, Nunzio Provenzano, Stephen Andretta, Thomas Andretta, and Gabriel Briguglio (the members of the Provenzano Group) from having any dealings, directly or indirectly, with any officer or employee of the Local 560 enterprise or any other labor organization or employee benefit plan; (2) enjoin Salvatore Provenzano, Joseph Sheridan, Josephine Provenzano, J.W. Dildine, Thomas Reynolds, Sr., Michael Sciarra, and Stanley Jaronko (the members of the Executive Board) from acting in any official capacity for or on behalf of Local 560 or its funds; (3) appoint one or more trustees to discharge all duties and responsibilities of the Executive Board of Local 560 until such time as free elections can be held; and (4) after the membership participation in a free election, permanently enjoin all individual defendants from having any future dealings of any nature whatsoever, directly or indirectly, with any officer, agent, representative, or employee of Local 560 or any other labor organization.
 
 
 13
 Before trial, the government entered into consent orders with defendants Anthony Provenzano, Nunzio Provenzano, and Thomas Andretta. The consent orders bar these three defendants from, among other things, (1) associating with any enterprise (within the meaning of 18 U.S.C. Sec. 1961) which seeks to dominate, control, or otherwise influence the affairs of any labor organization or any employee benefit plan and (2) acting as an officer, organizer, administrator, or representative for any labor organization or any employee benefit plan. In exchange, the government agreed to "not pursue any further civil claims against the defendant[s] based upon the transactions which are specifically enumerated in the Verified Complaint...." App. at 164A. Accordingly, pursuant to these consent orders, Anthony Provenzano, Nunzio Provenzano, and Thomas Andretta were removed as defendants prior to trial.
 
 
 14
 On November 1, 1982, prior to trial, the district court denied Local 560's 12(b)(6) motion to dismiss paragraph 12(a) of the government's complaint for failure to state a cause of action. United States v. Local 560, 550 F.Supp. 511 (D.N.J.1982). Paragraph 12(a), as previously noted, charged the Provenzano Group and the Executive Board with extorting members' rights to vote, speak, and assemble. The district court held that the extortion of intangible rights guaranteed to union members by the LMRDA's Bill of Rights, 29 U.S.C. Sec. 411, constituted a violation of the Hobbs Act, 18 U.S.C. Sec. 1951, and thus, would properly serve as a predicate act under RICO. The district court also rejected Local 560's argument that the LMRDA remedies are the exclusive remedies available in combatting the extortion of member's rights under that statute.
 
 
 15
 On January 25, 1983, the bench trial of this cause commenced. The trial lasted until May 17, 1983, comprising 51 days of testimony. On March 16, 1984, the district court entered its final order, granting the government's requested injunctive relief in all respects. At the same time, the district court withheld the appointment of a trustee because it stayed its order pending appeal. See Fed.R.Civ.P. 62. All of the defendants except alleged Provenzano Group members Stephen Andretta and Gabriel Briguglio filed timely notices of appeal.
 
 II.
 
 16
 The district court's analysis of the defendants' RICO Act violations in the instant case differed from the analysis on which the government's Complaint was based. The government's complaint referred to Local 560 as the "enterprise" for both its section 1962(b) and (c) counts. Thus, the government alleged in its complaint that the individual associates of the Provenzano Group violated 18 U.S.C. Sec. 1962(c) by participating in the conduct of the affairs of the Local 560 enterprise through a pattern of racketeering activity. Although the district court made findings consonant with this theory, it also held that the individual members of the Provenzano Group violated 18 U.S.C. Sec. 1962(c) by unlawfully participating in the conduct of the affairs of the Provenzano Group (not Local 560), which the district court held was the "enterprise" for purposes of 18 U.S.C. Sec. 1962(c).
 
 
 17
 In addition, although the government initially alleged separate and distinct predicate criminal offenses under sections 1962(b) and 1962(c), the district court held that there were several predicate offenses committed by the Provenzano Group members which served as the underlying predicate acts for both the section 1962(b) and section 1962(c) counts. Specifically, the district court, while attributing other predicate acts to either 1962(b) or 1962(c), see, e.g., n. 6, infra, held that the following crimes, among others, constituted predicate acts under both of the above subsections of the RICO Act:
 
 
 18
 (1) Dorn: Between approximately January 1, 1952 and June 1, 1959, Anthony Provenzano (leader of the Provenzano Group), while an official of Local 560, extorted payoffs from Walter Dorn and his company, Dorn Transport, Inc., in exchange for "labor peace." Anthony Provenzano was subsequently convicted on one count of Hobbs Act extortion under 18 U.S.C. Sec. 1957 for his part in the Dorn labor peace payoffs. App. at 24, 69.
 
 
 19
 (2) Castellitto: In 1961, Anthony Provenzano recruited Harold Konigsberg and Salvatore Briguglio to kill Anthony Castellitto, who was a popular member of Local 560 and who posed a threat to Anthony Provenzano's control of the union. On June 6, 1961, Konigsberg, Briguglio, Salvatore Sinno, and others, committed the murder. Salvatore Briguglio was killed while under indictment for the Castellitto murder, and on June 21, 1978, Anthony Provenzano was sentenced to life imprisonment for his part in the murder of Castellitto. App. at 24-25, 30, 70-71.
 
 
 20
 (3) Braun: Between November 30, 1961 and December 12, 1961, Nunzio Provenzano and Salvatore Briguglio attempted to extort labor peace payments (the Braun Payoff Demand case) from the Braun Company in violation of New York Penal Law Sec. 560 and Sec. 1294 (Conspiracy and attempted grand larceny). Nunzio Provenzano and Salvatore Briguglio were convicted and incarcerated for approximately 2 1/2 years in New York. App. at 25-26, 29, 69.
 
 
 21
 (4) Seatrain: Between December of 1969 and June of 1977, Anthony Provenzano, Stephen Andretta, Thomas Andretta, and Gabriel Briguglio unlawfully received "labor peace" payoffs from Interocean Services, Inc. and Di-Jub Leasing Inc. (Seatrain Labor Peace Payoffs) in violation of 18 U.S.C. Sec. 186(b). Anthony Provenzano and Thomas Andretta each received 20 years imprisonment for their part in the Seatrain payoffs, and Stephen Andretta and Gabriel Briguglio received 10 and 7 years imprisonment, respectively. App. at 22-23, 25, 28, 77.
 
 
 22
 (5) Romano: Between 1974 and 1977, Anthony Provenzano, aided and abetted by Salvatore Briguglio and Stephen Andretta, received kickbacks in connection with loans made by the union's Passaic and Bergen Funds to Thomas and Frank Romano in violation of 18 U.S.C. Sec. 1954. App. at 77-82.
 
 
 23
 (6) City-Man: Between January of 1971 and July of 1980, Nunzio Provenzano, Irving Cotler, and other individuals unlawfully received labor peace payoffs (the City-Man payoffs) from Pacific Intermountain Express Company, Mason and Dixon Lines, Inc. T.I.M.E.--DC, Inc., and Helms Express in violation of 28 U.S.C. Sec. 186(b). On May 5, 1981, Nunzio Provenzano was convicted on RICO charges stemming from these City-Man labor peace payoffs and was sentenced to 10 years imprisonment. App. at 26, 82-83.
 
 
 24
 Although the district court concluded that the crimes recounted above constituted predicate acts for purposes of both sections 1962(b) and 1962(c), the district court also held that the Provenzano Group's extortion of the LMRDA rights of union members--which was the only predicate act aided and abetted by the Local 560 Executive Board defendants--was a predicate act only for purposes of section 1962(b).[6]
 
 
 25
 The district court held that the extortion of the membership's democratic rights in violation of the Hobbs Act, 18 U.S.C. Sec. 1951, was accomplished by fostering a general climate of intimidation within Local 560. The district court stated that the failure to develop any political opposition to the leadership of Local 560 during the past 20 years demonstrated this climate of intimidation. The district court identified several discrete actions taken by the Provenzano Group and the Executive Board of Local 560 which helped nurture this climate of intimidation, and which resulted in numerous instances of extortion.
 
 
 26
 The actions taken by the Provenzano Group and the Executive Board, as found by the district court, included (1) the repeated appointments of convicted criminals and persons reputed to be involved in criminal activity to positions of trust and responsibility within Local 560; (2) the expenditure of Local 560 assets in the form of increased salary and pension benefits to Anthony Provenzano, who has committed three criminal offenses while a member of Local 560's Executive Board; (3) permitting the presence of convicted criminals and reputed criminals in the offices of Local 560; and (4) the failure of the Executive Board to counter perceptions on the part of Local 560's membership that it was unwise for the members to voice dissatisfaction with Executive Board policy.
 
 III.
 
 27
 We address first the issue which concerns both the Provenzano Group defendants and the Executive Board defendants: namely, whether the district court properly found a violation of section 1962(b) of the RICO Act. The district court held that the Provenzano Group members, aided and abetted by the Executive Board, acquired an interest in and control of Local 560 through a pattern of racketeering activity. See 18 U.S.C. Sec. 1962(b) n. 2 supra.
 
 
 28
 Central to the district court's section 1962(b) analysis is its finding that the Provenzano Group and the Executive Board extorted the membership's LMRDA rights to democratic participation in their union's affairs. LMRDA rights apply to every member of a labor organization. These rights include the right to nominate Union leaders; to vote in union elections; to meet and assemble freely with other members; and to express any views, arguments, or opinions at union meetings. 29 U.S.C. Sec. 411(a)(1) & (2) provides:
 
 
 29
 (a)(1) Equal rights.--Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.
 
 
 30
 (2) Freedom of speech and assembly.--Every member of any labor organizations shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: Provided, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.
 
 
 31
 Indeed, it is upon these predicate acts of extortion that the district court based its finding of liability.
 
 A.
 
 32
 (1)
 
 
 33
 As a threshold matter, there are certain evidentiary questions which this court must resolve that bear upon the extortion of LMRDA rights. At trial, the government, in attempting to prove that the Provenzano Group and the Executive Board of Local 560 extorted the LMRDA rights of union members, submitted various proofs to establish that many union members were fearful of exercising their statutory right to participate in the affairs of Local 560. As part of these proofs, the government sought to admit into evidence numerous newspaper and magazine articles,[7] spanning a twenty-year period, which reported the criminal activities of Provenzano Group members. The government argued that these articles were relevant and admissible, not to demonstrate the truth of the statements in the articles, but to demonstrate the perceived reputation of Provenzano Group members in the community.
 
 
 34
 The government further maintained that it was proper for the district court to infer that these articles were read by Local 560's membership and that the reputation of the Provenzano Group members intimidated the membership into surrendering their LMRDA rights. The district court, adopting the government's position, admitted the newspaper and magazine articles into evidence,[8] holding that "it may be a fair inference that the members kept abreast of certain events and that having read these articles they feared violence or economic retaliation if they exercised their LMRDA rights." App. at 1400.
 
 
 35
 The defendants argue that the district court improperly admitted these newspaper accounts into evidence for reputational purposes. Specifically, the defendants maintain that the government did not establish a sufficient foundation to allow in this evidence: namely, that the government did not introduce evidence, along with these articles, to indicate that members of Local 560 actually read the articles in question, and as a result of reading the articles, had developed a fear of the leadership of Local 560.
 
 
 36
 The district court, in admitting the evidence, relied principally on Webb v. Fuller Brush Co., 378 F.2d 500 (3d Cir.1967). In Webb, the plaintiffs brought a products liability tort suit for injuries sustained from using a facial hormone cream sold to the plaintiffs by the defendant. At trial, the plaintiffs sought to introduce articles discussing the dangers of certain hormones. The trial court disallowed the evidence. This Court reversed, holding that, since the defendant had a duty to warn of the dangers of the face cream if it knew or should have known that the product could be injurious, the articles were admissible for the purpose of proving whether the defendant should have alerted the plaintiffs to possible hazards. Although, in Webb, this court did not discuss the foundation necessary for the introduction of the articles, presumably, the plaintiffs there demonstrated that the articles were in a publication that the defendant, at the very least, should have been reading.[9]
 
 
 37
 In the instant case, unlike in Webb, in order for the articles to be admitted into evidence it must have been demonstrated, not that the members of Local 560 should have read the articles in question, but that members of Local 560 actually read these articles. The government at trial, however, did not develop this necessary foundation. Indeed, only one Local 560 member testified that he had ever read anything in the papers about the Provenzano Group and Local 560. August Muller, a Local 560 member who had been assaulted by Executive Board member Stanley Jaronko, stated that "[i]n the papers it said that there was an argument involved the prior night, and the man [Glockner] was dead the next morning ... I don't want anything to happen to me...." App. at 7668. We hold that this isolated reference to a single newspaper article afforded an insufficient foundation for the admission into evidence of several articles covering a period of twenty years.
 
 
 38
 (2)
 
 
 39
 Another evidentiary question involving the extortion of membership rights concerned the testimony of Raymond Wren. Wren, a Special Agent of the Department of Labor, testified at trial as to the reputation for violence and economic retribution of several former and current members of the Executive Board of Local 560. Wren based his testimony on interviews he had with 15 former and current members of Local 560. The defendants argue that the district court abused its discretion in admitting Wren's testimony because Wren did not base his testimony on a random sample of the Local 560 members, but rather interviewed only members whom he knew to be opponents of the Provenzano Group and the current Executive Board of Local 560. The government, on the other hand, argues that the validity of Wren's "sample" goes only to the weight of his testimony, and not to its admissibility.
 
 
 40
 We recognize that, in modern, complex litigation, investigative and research surveys may be properly admitted into evidence for a variety of purposes. Indeed, in United States v. 88 Cases, etc., 187 F.2d 967 (3rd Cir.), cert. denied, 342 U.S. 861, 72 S.Ct. 88, 96 L.Ed. 647 (1951), this Court held that a scientific survey of 3539 individuals was admissible as evidence. We concluded that the survey was not hearsay because it was used, not to prove the truthfulness of the numerous responses, but rather to prove the reaction of the general public. We further held that "[t]he technical adequacy of the surveys was a matter of the weight to be attached to them." Id. at 974.
 
 
 41
 Here, however, we have a different situation. Contrasted with the random sampling of individuals in 88 cases, in this case, no attempt was made to establish a scientific basis for the selection of individuals interviewed. Indeed, Wren, himself, admitted that his "survey" did not comport with accepted survey techniques. App. at 663.
 
 
 42
 In the instant case, Wren's testimony was introduced to prove the reputation of past and present members of the Executive Board as perceived by the membership of Local 560. However, as we have noted, Wren did not engage in a scientific, random survey of Local 560's membership. Instead, as Wren conceded at trial, he approached only those past and present members of Local 560 whom he knew to be hostile to the leadership of Local 560.[10] Such an approach, by its very nature, is suspect because of its biased and selective character. Wren's one-sided sampling did no more than represent the opinion of a few, known opponents of the Local 560 membership. Although the membership in general may have subscribed to the same opinions as those expressed by Wren's 15 interviewees, Wren's survey technique was not designed to, nor did it, record the impressions of the membership at large. See Pittsburgh Press Club v. United States, 579 F.2d 751, 758 (3d Cir.1978) ("A proper universe must be examined and a representative sample must be chosen" for a survey to be trustworthy.) (emphasis in original).
 
 
 43
 While, in normal course, a research survey conducted in accordance with accepted standards of sampling may be admitted into evidence to be then tested for its weight, where a survey is offered that has met no such standards and, indeed, where that survey is conceded to have been deliberately partisan in its limited sampling, the prejudicial effect of such a flawed survey substantially outweighs any probative value it may have. See Fed.R.Evid. 403. In such an instance, admissibility must be denied and weight cannot be attributed to testimony of this nature. Because Wren's testimony was predicated on such a flawed survey, we conclude that the district court abused its discretion in admitting Wren's testimony into evidence.[11]
 
 
 44
 Thus far, we have held that the district court abused its discretion by admitting into evidence: (1) the newspaper and magazine articles and (2) Wren's testimony. Both of these evidentiary submissions were offered to prove that the rank and file of Local 560 was fearful of their union leadership. The government's contention is that, by establishing a climate of fear within Local 560, the Provenzano Group and the Executive Board of Local 560 were able to extort the membership's LMRDA rights in violation of the Hobbs Act, 18 U.S.C. Sec. 1951.
 
 
 45
 (3)
 
 
 46
 The question remains, however, whether the admission of this evidence by the district court was fatal to the government's charges, or whether the district court, in erring, committed error which was harmless. As this court held in DeLaval Turbine, Inc. v. West India Industries, Inc., 502 F.2d 259, 263-64 (3d Cir.1974), "[i]t is well settled that in a non-jury case, an appellate court will not reverse on the basis of an erroneous admission of evidence unless (1) there is insufficient evidence other than the challenged evidence to support the district court's conclusion, or (2) the district court is induced by the challenged evidence to make an essential finding that it would not have made otherwise." Accordingly, in the instant case, we must determine whether there exists sufficient evidence in the record (apart from the newspaper and magazine articles and Wren's testimony) to support the district court's conclusion that the rights of Local 560's rank and file were extorted.
 
 
 47
 It was on the basis of several sources that the district court concluded that the Provenzano Group and the Executive Board extorted the LMRDA rights of a substantial segment of Local 560's membership. Of these sources, one of the most prominent was the testimony of Professor Clyde Summers.
 
 
 48
 Professor Summers, who has specialized in labor law since 1943, testified as an expert witness for the government. According to Professor Summers, a significant proportion of Local 560's rank and file were induced by fear of the Provenzano Group to surrender their membership rights. Summers' conclusion that the membership did not feel free to criticize openly the policies and practices of the Local 560 leadership (and, thus, were fearful of exercising their union democratic rights) was based primarily on the observation that, throughout the history of Local 560, incidents which should have raised criticism of Local 560's leadership among its membership, did not. Among the incidents which Summers' believed should have spurred membership reaction were: the murder of Walter Glockner the morning after his public display of opposition at a union meeting; the many convictions of union officials on union-related offenses; the failure of the Executive Board to take any action when an official was indicted; the appointment and reappointment of persons who had been convicted of union related offenses; the payment of salary increases to Anthony Provenzano; the appointment of Anthony's daughter, Josephine Provenzano, to the office of Secretary-Treasurer of the union following Anthony's incarceration; and the proposal to pay Anthony Provenzano a one-half salary pension despite his conviction for the murder of Anthony Castellitto. As Professor Summers testified, "[I]t is beyond belief that 10,000 members would sit by and watch these things done and never utter a peep", unless a substantial number of the membership were fearful for their lives or their jobs. App. at 1608.
 
 
 49
 The district court accepted Summers' testimony as convincing, and we agree. There seems to be no other plausible explanation for the silence of Local 560's membership in the face of repeated outrageous events. The district court, placing an emphasis on Summers' testimony, found that the silence was due to the repressive atmosphere of Local 560, an atmosphere created and maintained by the Provenzano Group and the Executive Board. We cannot characterize such a finding as clearly erroneous.
 
 
 50
 In addition to the testimony of Professor Summers, the district court, in determining that the membership's rights had been extorted, also relied on the testimony of August Muller. Muller, an employee of Maislin Brothers Trucking Company and a member of Local 560, testified at trial that, at a general membership meeting in 1983, he heard Salvatore Provenzano state that Maislin would soon be out of business because the International Brotherhood of Teamsters would insist that Maislin repay certain monies which Teamster employees had loaned the company. After hearing Salvatore Provenzano's warning, Muller testified that Local 560 Business Agent Stanley Jaronko went to the Maislin terminal to hold a meeting and speak to the drivers. At this meeting, Muller challenged Jaronko about the statements Salvatore Provenzano had made earlier at the general membership's meeting. The exchange between Muller and Jaronko became increasingly heated, and Jaronko ultimately struck Muller, sending him into a wall. It was after this altercation that Muller recalled the shooting death of Walter Glockner, which occurred the morning after Glockner had voiced opposition to Local 560's leadership at a general meeting.
 
 
 51
 At trial, Muller was called to testify about the incident. The district court observed that: "Throughout his direct and cross-examination, Muller's demeanor evinced the precise attributes of a man in the grip of extreme fear or even sheer terror because of what he was being compelled to say publicly." App. at 89 (emphasis added). Professor Summers' testimony indicated that Muller's feelings and fears were shared by a large percentage of Muller's compatriots. App. at 1608. As the district court noted, Muller's testimony dramatically illustrated the climate of fear within Local 560 and served to support and reinforce Professor Summers' conclusion that the membership's LMRDA rights to democratic participation in Local 560 were extorted through intimidation and fear.
 
 
 52
 Accordingly, we believe that the district court was not clearly erroneous in finding that the Provenzano Group and the Executive Board had extorted the LMRDA rights of a substantial number of Local 560 members. This finding, predicated on Professor Summers' and Muller's testimony, does not depend on the evidence erroneously admitted, namely the newspaper articles and Wren's survey. Hence, under the DeLaval, supra, standard, even though the district court may have erred in admitting these two categories of evidence, that error was harmless and the district court's finding, based on evidence independent of the challenged evidence, must be sustained. See also Anderson v. City of Bessemer, --- U.S. ----, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).
 
 B.
 
 53
 The district court not only found by a preponderance of the evidence[12] that the Provenzano Group and the Executive Board extorted the membership's LMRDA rights, but also concluded that such extortions constituted predicate acts for purposes of section 1962(b) of the RICO Act, 18 U.S.C. 1962(b).[13] United States v. Local 560, 550 F.Supp. 511 (D.N.J.1982). Section 1962(b) makes it unlawful for any person to maintain an interest in, or control of, any enterprise through a pattern of "racketeering activity." Section 1961(1) of the RICO Act, in relevant part, defines "racketeering activity" as "any act which is indictable under ... section 1951 [of title 18: the Hobbs Act] (relating to interference with commerce, robbery, or extortion)...." Thus, in the instant case, the question is whether the extortion of the membership's LMRDA rights constitutes a Hobbs Act violation so as to satisfy the predicate act requirement of section 1962(b) of the RICO Act.
 
 
 54
 The Hobbs Act, 18 U.S.C. Sec. 1951,[14] prohibits the obstruction or interference with commerce by use of threats or extortion. This court has held that the primary elements of a Hobbs Act violation are that (1) that the defendants induce their victims to part with property; (2) that the defendants do so through the use of fear; and (3) that, in so doing, the defendants adversely affect interstate commerce.[15] United States v. Addonizio, 451 F.2d 49, 59 (3d Cir.1971), cert. denied, 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972).
 
 
 55
 (1)
 
 
 56
 The defendants initially argue that the membership's LMRDA rights are intangible property rights, and as such, cannot be the basis for a claim of extortion under the Hobbs Act. Defendants maintain that only the extortion of tangible property (i.e. physical items or possessions) can be cognizable as a Hobbs Act violation.
 
 
 57
 However, the language of the Hobbs Act makes no such distinction between tangible and intangible property. Section 1951(b)(2) broadly defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force...." Moreover, other circuits which have considered this question are unanimous in extending the Hobbs Act to protect intangible, as well as tangible, property. See United States v. Zemek, 634 F.2d 1159 (9th Cir.1980), cert. denied, 450 U.S. 916, 101 S.Ct. 1359, 67 L.Ed.2d 341 (1981) (right to solicit business accounts); United States v. Santoni, 585 F.2d 667 (4th Cir.1978), cert. denied, 440 U.S. 910, 99 S.Ct. 1221, 59 L.Ed.2d 459 (1979) (right to make business decisions free from outside pressure wrongfully imposed); United States v. Nadaline, 471 F.2d 340 (5th Cir.), cert. denied, 411 U.S. 951, 93 S.Ct. 1924, 36 L.Ed.2d 414 (1973) (right to solicit business accounts); United States v. Tropiano, 418 F.2d 1069 (2d Cir.1969), cert. denied, 397 U.S. 1021, 90 S.Ct. 1262, 25 L.Ed.2d 530 (1970) (right to solicit business accounts).
 
 
 58
 Moreover, at least one court has expressly addressed the question of whether rights incident to union membership are protectible property interests. In Dusing v. Nuzzo, 177 Misc. 35, 29 N.Y.S.2d 882 (Sup.Ct. Ulster County), modified on other grounds and aff'd, 263 A.D. 59, 31 N.Y.S.2d 849 (1941), the court held that such rights are "as real and as needful of equitable protection, surely, as money or chattels."
 
 
 59
 The right to membership in a union is empty if the corresponding right to an election guaranteed with equal solemnity in the fundamental law of the union is denied. If a member has a "property right" in his position on the roster, I think he has an equally enforceable property right in the election of men who will represent him in dealing with his economic security and collective bargaining where that right exists by virtue of express contract in the language of a union constitution.
 
 
 60
 29 N.Y.S.2d at 884. This holding is significant because the Hobbs Act's definition of extortion was closely modelled on that in the New York statute and Congress intended that extortion as used in the Hobbs Act reflect the common understanding of the states. See United States v. Enmons, 410 U.S. 396, 406 n. 16, 93 S.Ct. 1007, 1013 n. 16, 35 L.Ed.2d 379 (1973). Thus, we conclude that the membership's intangible property right to democratic participation in the affairs of their union is properly considered extortable "property" for purposes of the Hobbs Act.[16]
 
 
 61
 (2)
 
 
 62
 The defendants argue, alternatively, that section 530[17] of the LMRDA, 29 U.S.C. Sec. 530, is the exclusive criminal sanction for violating a union member's rights, and that, therefore, the district court erred in concluding that the extortion of membership LMRDA rights could also constitute a Hobbs Act violation. The defendants maintain that the government may not apply the Hobbs Act in the present RICO context because Section 530 of the LMRDA, which was enacted subsequent to the Hobbs Act and which punishes the same proscribed behavior as the Hobbs Act, preempts the Hobbs Act in this case. See generally Morton v. Mancari, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974) (in certain instances a specific statute governs over a more general one).[18] The government counters that section 530 does not limit the applicability of the Hobbs Act to the facts of the present case because section 530 and the Hobbs Act were designed to prohibit different types of conduct. We are satisfied that, because the underlying purpose and design of section 530 is different from that of the Hobbs Act, section 530 does not supercede the use of the Hobbs Act in the instant case. While the Hobbs Act, as evidenced by its explicit and unambiguous language, was designed to combat extortion, section 530 of the LMRDA makes no mention of "extortion" and rather appears to focus on prohibiting physical assaults on members in connection with a union's internal affairs and in the exercise of their statutory rights. In this regard, we note that Senator Morse, in opposing the passage of section 530, stated:
 
 
 63
 Generally speaking, the effect of these provisions is to make assault and battery a Federal crime, but only when it occurs in a union. I have already referred above to the inappropriateness of provisions of this type for the enforcement of the rights of union members.
 
 
 64
 105 Cong.Rec. 16,389 (1959). The limited reach of section 530 is also demonstrated by the language of the LMRDA which states that the Act was enacted as "further and supplementary legislation that will afford necessary protection of the rights and interests of employees and the public generally." 29 U.S.C. Sec. 401(b) (emphasis added).
 
 
 65
 Section 530, in relevant part, prohibits "the use of force or violence, or threat of the use of force or violence, to restrain, coerce, or intimidate ... any member of a labor organization for the purpose of interfering with or preventing the exercise of any right to which he is entitled under the provisions of this chapter...." 29 U.S.C. Sec. 530. Although this language of section 530 is broad, and conceivably could cover extortionate conduct, we observe that those cases which have construed section 530 have all involved some form of assault and battery. See United States v. Williams, 624 F.2d 75 (9th Cir.1980) (defendant hired individual to assault union member); United States v. Kelley, 545 F.2d 619 (8th Cir.1976), cert. denied, 430 U.S. 933, 97 S.Ct. 1555, 51 L.Ed.2d 777 (1977) (defendant fired three shots at truck carrying three union members); United States v. Bertucci, 333 F.2d 292 (3d Cir.), cert. denied, 379 U.S. 839, 85 S.Ct. 75, 13 L.Ed.2d 45 (1964) (fight involving union members); United States v. Roganovich, 318 F.2d 167 (7th Cir.), cert. denied, 375 U.S. 911, 84 S.Ct. 206, 11 L.Ed.2d 150 (1963) (fight involving union members).
 
 
 66
 In contrast, cases brought under the Hobbs Act frequently involve schemes to extort through the creation of indirect fear. See, e.g., United States v. Hedman, 630 F.2d 1184, 1194 (7th Cir.1980) (extortion found although victim "happy" to make payments and relations between victim and extorters was "cordial"), cert. denied, 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981); United States v. Sander, 615 F.2d 215 (5th Cir.) (Hobbs Act covers fear of economic loss and "subtle extortions"; government need not show that fear was direct consequence of threat or that victim personally feared extorter), cert. denied, 449 U.S. 835, 101 S.Ct. 108, 66 L.Ed.2d 41 (1980).
 
 
 67
 Here, of course, the extortion of rights which the government's complaint charged was achieved, not so much by direct physical assault (as is proscribed by section 530), but by more sophisticated and indirect physical and economic threats. It was intimidation and fear, as found by the district court, that caused the members of Local 560 to surrender their LMRDA democratic rights. The Hobbs Act, much more so than section 530, is designed to combat extortion, whether such extortion involves LMRDA rights or more tangible property.
 
 C.
 
 68
 In the preceding sections of Part III of this opinion, where we discussed the Hobbs Act as a predicate act under Sec. 1962(b), we held that the district court did not err when it concluded that both the Provenzano Group and the Executive Board had extorted the rights of Local 560's members and that the acts of extortion came within section 1962(b) of RICO. In so concluding, the district court held that the Executive Board had aided and abetted the extortionate acts. Specifically, the district court held that the Executive Board defendants aided in extorting member's rights by (1) making certain appointments and reappointments to union offices; (2) failing to remove certain appointees from office; (3) spending union assets for Anthony Provenzano; (4) permitting access to local 560's offices by known or reputed criminals; and (5) being recklessly indifferent to the above-mentioned systematic misconduct of fellow incumbent officers. App. at 96-97, 148-150. These actions by the Executive Board defendants--particularly the appointment of known criminals to union office and the expenditure of union assets for Anthony Provenzano--aided and abetted the Provenzano Group in establishing the climate of fear and intimidation found to exist within Local 560 by the district court. These actions, in turn, coerced a substantial portion of the membership into relinquishing their LMRDA rights. The district court concluded that, because of the offenses committed by the Executive Board, the members of that board had to be removed from office to "prevent and restrain" future violations of section 1962 of the RICO Act.
 
 
 69
 The defendants argue that the district court misapplied the law of aiding and abetting to the actions of the Executive Board. The defendants maintain that, while the Executive Board may have violated certain fiduciary standards, the Board's actions did not constitute criminal aiding and abetting.
 
 
 70
 However, the district court did, in fact, rely on the appropriate test for establishing liability under the aiding and abetting statute, 18 U.S.C. Sec. 2. In United States v. Dixon, 658 F.2d 181, 189 n. 17 (3d Cir.1981), this Court held that:
 
 
 71
 In order to convict a defendant of aiding and abetting the commission of a crime, the Government must prove two essential elements: (1) that the substantive crime has been committed; and (2) that the defendant charged with aiding and abetting that crime knew of the commission of the substantive offense and acted with the intent to facilitate it.
 
 
 72
 We conclude, as did the district court, app. at 140, that, although the present case is civil in character, the criminal standard for aiding and abetting applies. Applying the Dixon two-part test, the district court examined the surrounding circumstances and found not only that the substantive crimes had been committed, but that the Executive Board defendants knew of their commission and demonstrated the requisite intent.
 
 
 73
 The defendants, citing the district court's discussion of the elevated duty of care owed to union members by their officers, argue that the district court found liability based on the Executive Board's violation of fiduciary responsibility rather than on the Executive Board's criminal intent. We do not, however, agree with the defendants' reading of the district court's opinion. The district court addressed the ethical duty that union officers owe membership for the purpose of examining the extortion of LMRDA rights in the correct light. As the district court noted, "the knowledge and volitional act requirements of Dixon 's second element have different meanings in various contexts." App. at 140. Thus, the district court simply recognized that, if an individual fails to act when he has an affirmative duty to do so, negative inferences concerning his intent can be drawn from this inaction. Moreover, it has long been settled that it is permissible to infer from circumstantial evidence the existence of intent. United States v. Burrell, 496 F.2d 609, 610 (3d Cir.1974).
 
 
 74
 The defendants further argue that the district court was clearly erroneous in finding that the Executive Board's (1) repeated appointments; (2) failure to remove appointees from office; (3) expenditure of union assets for Anthony Provenzano; and (4) allowance of access to Local 560 offices by known or reputed criminals, aided the Provenzano Group in extorting the membership's rights. We disagree. Our reading of the record discloses ample evidence supporting the district court's subsidiary findings as well as its ultimate finding of aiding and abetting. Indeed, in our view, the evidence of Local 560's history of appointments of individuals with criminal convictions to positions of responsibility within the union, not to mention the expenditure of union funds for the personal benefit of Anthony Provenzano, more than adequately support the district court's finding.
 
 
 75
 (1)
 
 
 76
 With regard to the repeated appointments to union office by the Executive Board of known or reputed criminals, the following chronology by the district court is instructive:
 
 
 77
 (a) During September of 1961, Anthony Provenzano and other members of the Local 560 Executive Board (which then included Salvatore Provenzano) appointed Salvatore Briguglio to the position of Business Agent--notwithstanding the fact that Anthony Provenzano then knew that Salvatore Briguglio had murdered Anthony Castellitto, and notwithstanding the fact that rumors to that effect were circulating among the membership at that time.(b) On or about February 1, 1963, Anthony Provenzano and the other Executive Board members (including Salvatore Provenzano) appointed Nunzio Provenzano to the position of Business Agent--notwithstanding the fact that three days earlier, on January 29, 1963, Nunzio Provenzano had been convicted (together with Salvatore Briguglio) of an offense involving a payoff demand.
 
 
 78
 (c) In 1964, Anthony Provenzano and the other Executive Board members (including Salvatore Provenzano) appointed Robert A. Luizzi to the position of Business Agent--notwithstanding the fact that Luizzi had been convicted in 1945 of a felonious assault and battery and in 1949 of felonious breaking and entry, and had been arrested on four separate occasions thereafter in Hudson County of Disorderly Person, Aggravated Assault, Deadly Weapon and Aiding and Abetting a Robbery.
 
 
 79
 (d) On or about May 15, 1967, Salvatore Provenzano and the other Executive Board Members appointed Robert A. Luizzi to the position of Trustee--notwithstanding his criminal record as outlined in (c) above.
 
 
 80
 (e) On or about April 25, 1969, Salvatore Provenzano and J.W. Dildine and the other members of the Local 560 Executive Board appointed Salvatore Briguglio to the position of Business Agent--notwithstanding the fact that Salvatore Briguglio had just completed the term of imprisonment for his 1963 conviction in New York State.
 
 
 81
 (f) On or about April 25, 1969, Salvatore Provenzano, J.W. Dildine and the other Executive Board members appointed Nunzio Provenzano to the position of "clerk" at the uniquely high salary of some $18,000 per year--notwithstanding the fact that Nunzio Provenzano had just completed the term of imprisonment for his 1963 conviction in New York State, and was forbidden by the terms of his parole from being an officer in the union.
 
 
 82
 (g) In 1970, Salvatore Provenzano, J.W. Dildine and the other Executive Board members appointed Thomas Reynolds, Sr. to the position of Business Agent--notwithstanding the fact that Thomas Reynolds, Sr. had pled guilty in 1948 to misdemeanor assault (having been charged with felonious assault), had been convicted in 1958 of felony robbery and had been arrested on five separate occasions for rape (1948), grand larceny (1952), rape (1961), armed robbery (1961), and as a material witness (and, in the minds of some, suspect) in the murder of Walter Glockner (1963).
 
 
 83
 (i) In 1970, Salvatore Provenzano, J.W. Dildine and other members of the Local 560 Executive Board appointed Nunzio Provenzano to the position of Trustee of the Trucking Employees of Passaic and Bergen Counties Pension and Welfare Funds--notwithstanding the fact of his previous conviction and incarceration in New York State.
 
 
 84
 (j) In 1972, Salvatore Provenzano, J.W. Dildine and the other Executive Board members appointed Salvatore Briguglio to the position of Trustee of the Trucking Employees of Passaic and Bergen Counties Pension and Welfare Funds--notwithstanding the fact of his previous conviction and incarceration in New York State, and notwithstanding the fact that pervasive rumors had linked him to the "disappearance" of Anthony Castellitto.
 
 
 85
 (k) On or about January 25, 1973, Salvatore Provenzano, J.W. Dildine and the other Executive Board members appointed Nunzio Provenzano to the position of Secretary-Treasurer--notwithstanding his prior conviction and incarceration.
 
 
 86
 (l) On or about September 12, 1975, Salvatore Provenano [sic], J.W. Dildine and the other members of the Executive Board appointed Thomas Reynolds, Sr. to the position of Trustee of the Trucking Employees of Passaic and Bergen Counties Pension and Welfare Funds--notwithstanding his criminal record and rumored involvement in the Glockner murder.
 
 
 87
 (m) In February 1974, Salvatore Provenzano, Nunzio Provenzano, J.W. Dildine and the other members of the Local 560 Executive Board reappointed Salvatore Briguglio to the position of Business Agent--notwithstanding the fact that Salvatore Briguglio had just completed a term of imprisonment on a federal counterfeiting conviction.
 
 
 88
 (n) On or about March 12, 1974, Salvatore Provenzano, Nunzio Provenzano, J.W. Dildine and the other members of the Local 560 Executive Board appointed Robert A. Luizzi to the position of Trustee of the Trucking Employees of Passaic and Bergen Counties Welfare and Pension Fund--notwithstanding his criminal record as outlined above.
 
 
 89
 (o) On or about November 24, 1975, Salvatore Provenzano, J.W. Dildine and the other Executive Board Members appointed Anthony Provenzano and Nunzio Provenzano to the positions of Secretary-Treasurer and President, respectively--notwithstanding the fact that Anthony Provenzano had been convicted of labor racketeering and Nunzio Provenzano had been convicted of a felony involving a payoff demand.
 
 
 90
 (p) On or about February 9, 1977, Anthony Provenzano, Salvatore Provenzano, Nunzio Provenzano, J.W. Dildine and the other members of the Executive Board appointed Thomas Reynolds, Sr. to the position of Trustee of Local 560--notwithstanding his criminal record and his rumored involvement in the Glockner murder.
 
 
 91
 (q) In 1981, Nunzio Provenzano, Salvatore Provenzano, Joseph Sheriden, Josephine Provenzano, J.W. Dildine, Thomas Reynolds, Sr., Stanley Jaronko and Michael Sciarra, as members of the Executive Board of Local 560, appointed Robert A. Luizzi to the position of Business Agent--notwithstanding the fact that Luizzi had a criminal record involving crimes of violence, and notwithstanding the fact that Luizzi had been identified in sworn testimony as having solicited labor peace payoffs or bribes from Helms Express, a trucking company then under contract with Local 560.
 
 
 92
 App. at 89-93.
 
 
 93
 Despite this lurid history, the defendants maintain that none of the appointments "violated any law". The fact, however, that these appointments were in technical compliance with the federal law concerning union officer eligibility[19], does not mean that the appointments did not serve to intimidate the rank and file, and thus extort LMRDA rights in violation of the Hobbs Act.[20] Indeed, the district court found that the history of Provenzano Group appointments to union office did cause a substantial portion of Local 560's membership to surrender their right to democratic participation in the affairs of the union. Since the district court's findings--both subsidiary and ultimate--are well supported by the record, we decline to disturb them.[21] See Anderson v. City of Bessemer, --- U.S. ----, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).
 
 
 94
 (2)
 
 
 95
 The district court also held that the Executive Board's expenditure of Local 560 assets (in the form of accrued salary and pension payments) for the benefit of Anthony Provenzano, who had three times committed offenses while in office, helped (aided and abetted) in extorting the membership's LMRDA rights. With regard to the payment of accrued salary, the record indicates that on December 20, 1962, approximately one month after Anthony Provenzano had been indicted in the Eastern Freightways case, defendant Michael Sciarra made a successful motion at a membership meeting to increase Anthony Provenzano's yearly salary from $20,800 to $45,800. One week earlier Provenzano had won re-election as Local 560 President and had previously been appointed an International vice-president under Jimmy Hoffa, who was then President of the Teamsters International union. Sciarra stated that he made the motion because Provenzano needed the money for his legal expenses. Within two months, on February 14, 1963, Stephen Andretta made a second motion to increase Provenzano's salary. This time, Provenzano's annual salary was increased from $45,800 to $95,000. Andretta stated that he made the motion because he felt that Provenzano should be paid as much as Hoffa, who was then making $100,000 a year.
 
 
 96
 On March 13, 1963, Anthony Provenzano told the membership that he was "not taking a penny of the increases offered me by the membership" and would not do anything to "impoverish" the union. In mid-1966, Anthony Provenzano was incarcerated and on July 21, 1966, the membership, upon the motion of Michael Sciarra, voted to reduce the salary for the office of the President from $95,000 to $20,800--effective upon the appointment of Salvatore Provenzano as President on May 6, 1966.
 
 
 97
 On January 30, 1969, Anthony Provenzano, who was still in prison, told his attorney to mail a letter to Local 560 requesting that it issue a check to him in the amount of $25,000 "on account of back salary due and owing to him." In response, the Executive Board, after consultation with attorneys and accountants, paid to Provenzano approximately $25,000 a year from 1969 through 1976, a total of about $197,850. These payments represented all but approximately $48,785 of the money which Anthony Provenzano would have received as a result of these salary increases. The payments were stopped by the Local in 1976 because the officers believed that the union could not afford to continue the outlays. The only year that Anthony Provenzano was in office during the time he received payments was 1976.
 
 
 98
 With respect to these salary payments, the district court stated:
 
 
 99
 Local 560 received no benefit in exchange for the payment of these funds to Anthony Provenzano. Contrary to his representation to the membership on March 13, 1963, the payments ... did in fact 'impoverish' the Local. His ability to extract these payments from Local 560 provides further evidence of the strength and domination of the Provenzano Group and its exploitation of Local 560 for its own purposes.
 
 
 100
 App. at 73.
 
 
 101
 Anthony Provenzano, however, not only received accrued salary from Local 560, but also received a pension bonus. On November 9, 1976, when Anthony Provenzano had returned to the union as Secretary-Treasurer following his prison sentence in the Dorn case (and his five year ineligibility period arising out of his conviction), it came to the Local's attention that, because of a break in his union service, Anthony Provenzano would not receive a pension from the Teamsters. The Local then voted to pay Anthony one-half his weekly salary at the time of retirement as a pension benefit. Payment of his one-half salary began in 1979 and continued through 1981, when it was voluntarily terminated pending the outcome of this litigation. Regarding these pension benefits, the district court held:
 
 
 102
 In his testimony, Salvatore Provenzano stated that he had "no idea" how Local 560 would benefit from the payment of this one-half pension. Trustee Michael Sciarra also knows of no benefit to Local 560 which flows from these payments other than to keep "the members happy--they voted for it." The ability of the Provenzano Group to exact these payments is clearly demonstrative of its strength, influence and continuing ability to control and exploit Local 560 for its own purposes--at the expense of the membership.
 
 
 103
 App. at 84.
 
 
 104
 The district court found that neither the salary increases nor the pension payments were in the best interests of Local 560 or its membership, but rather that these payments were solely for the personal benefit of Anthony Provenzano. The district court also found that the Executive Board, by failing to take the position that the payments were not in the union's interest[22], intentionally aided and abetted in the Provenzano Group's further extortion of membership rights.[23] We hold that the district court's findings concerning payments made to Anthony Provenzano were not clearly erroneous and the district court did not err when it concluded that these payments represented an additional Hobbs Act extortion by the Provenzano Group and the Executive Board.[24]
 
 
 105
 (3)
 
 
 106
 Finally, the defendants argue that certain members of Local 560's Executive Board, namely Joseph Sheridan and Josephine Provenzano (who were appointed in 1978) and Michael Sciarra and Stanley Jaronko (who were appointed in 1981), were not members of the Executive Board when many of the Hobbs Act extortions occurred. As a result, the defendants maintain that these Executive Board members did not aid and abet[25] the necessary two predicate offenses under the RICO Act.
 
 
 107
 However, the record does not support this contention. Rather, the evidence discloses that Michael Sciara and Stanley Jaronko, the most recent members of the Executive Board, aided and abetted in at least two predicate Hobbs Act extortions. For example, Anthony Provenzano's pension payments, which represented a Hobbs Act extortion, extended through 1981. Each Executive Board member, by not objecting to these payments which did not benefit the union, necessarily aided and abetted in the extortion. During that time period, both Sciara and Jaronko were on the Executive Board.
 
 
 108
 In addition, in 1981, the Executive Board appointed Robert Luizzi to the position of Business Agent--notwithstanding Luizzi's criminal record. The district court held that Luizzi's appointment, and similar appointments, also constituted part and parcel of the extortion of membership rights under the Hobbs Act. Further, in 1981, the Executive Board refused to remove Nunzio Provenzano from office, despite the fact that he had been convicted in the City-Man case. As noted, during this period, the four members of the Executive Board who the defendants claim did not aid and abet the extortionate activities found by the district court, were active members of the Board.
 
 
 109
 Thus, each individual Executive Board member has aided and abetted in at least two predicate acts, and accordingly, each such member is, in his or her own right, culpable for the extortion of the membership's rights. See United States v. Stubin, 446 F.2d 457, 463 (3rd Cir.1971).
 
 IV.
 
 110
 Having thus far determined that the district court did not err in concluding that the membership's rights to democratic participation in Local 560 were extorted by the Provenzano Group and the Executive Board in violation of Sec. 1962(b) of the RICO Act, the question remains whether the Provenzano Group was properly characterized by the district court as a "person" for purposes of 1962(b) and an "enterprise" for purposes of section 1962(c) of the RICO Act. As stated earlier, section 1962(b) of the RICO Act prohibits any "person" from acquiring an interest in and control of any "enterprise" through a pattern of racketeering activity. 18 U.S.C. Sec. 1962(b).[26] Section 1962(c) makes it unlawful for any "person" to conduct or participate in the affairs of an "enterprise" through a pattern of racketeering activity. Referring to Section 1962(b), the district court determined that the Provenzano Group was a "person", and that Local 560 was the "enterprise"[27] in which the Provenzano Group acquired an interest. The district court, then referring to section 1962(c), held that the named Provenzano Group defendants--as individuals--were "persons" for purposes of that section, and that the Provenzano Group, as a separate entity, represented an "enterprise".
 
 A.
 
 111
 The defendants, relying primarily on Haroco, Inc. v. American National Bank and Trust Co., 747 F.2d 384 (7th Cir.1984), aff'd, --- U.S. ----, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985) (per curiam opinion),[28] argue that the Provenzano Group cannot be properly characterized as a "person" under section 1962(b) of the RICO Act. Section 1961(3) of the RICO Act defines "person" as "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. Sec. 1961(3). The defendants cite to dicta in the Seventh Circuit's Haroco opinion, which states that:
 
 
 112
 Where persons associate "in fact" for criminal purposes, see [United States v. Turkette, 452 U.S. 576, 583 [101 S.Ct. 2524, 2528, 69 L.Ed.2d 246] (1981) ], each person may be held liable under RICO for his, her or its participation in conducting the affairs of the association in fact through a pattern of racketeering activity. But the nebulous association in fact does not itself fall within the RICO definition of "person".... In the association in fact situation, each participant in the enterprise may be a "person" liable under RICO, but the association itself cannot be.
 
 
 113
 Id. at 401.
 
 
 114
 In the instant case, however, the district court did not treat the Provenzano Group as a "nebulous association in fact". Rather, the district court, as the government suggests, regarded the Provenzano Group as representing a conspiracy of seven identifiable, culpable individuals. As we read and understand the district court's discussion, the term "Provenzano Group" was utilized by the district court as simply a convenient appellation for the collective defendants and was not meant to represent, in itself, a "person" for purposes of 1962(b). Indeed, the individual conspirators in question were included as named defendants in the government's complaint and were identified by name in the district court opinion. Moreover, the district court held that "the culpability of the individual associates of the Provenzano Group under Sec. 1962(b) ... has been established by their own conduct." App. at 147 (emphasis added). Thus, while the district court might have been more explicit in its holding, it is the individual Provenzano Group defendants who are the "persons" for purposes of 1962(b) and not the Provenzano Group as a separate entity.[29]
 
 B.
 
 115
 The district court also held, and the defendants hotly contested, that the Provenzano Group is an "enterprise" for purposes of section 1962(c) of the RICO Act. Section 1961(4) of the RICO Act broadly defines an "enterprise" as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. Sec. 1961(4).
 
 
 116
 In United States v. Riccobene, 709 F.2d 214, 221 (3rd Cir.1983), cert. denied, 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1984) this Court limited the definition of "enterprise", holding that, to establish an enterprise as defined by section 1961(4), the government must demonstrate "evidence of an ongoing organization, formal or informal, and evidence that the various associates function as a continuing unit. In addition, the enterprise must be shown to have an existence 'separate and apart from the pattern of activity in which it engages.' " (Citations omitted) See also United States v. Turkette, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981).
 
 
 117
 In the instant case, the district court applied the Riccobene standard and found that the individuals forming the Provenzano Group as well as the Provenzano Group itself have "maintained an ongoing organizational structure in the form of a hierarachy and protocol during approximately the past thirty-five years." App. at 62. The court then held the Provenzano Group to be an "enterprise" for purposes of its analysis under section 1962(c), and concluded that the individual Provenzano Group associates had conducted the affairs of the enterprise through a pattern of racketeering activity.
 
 
 118
 The defendants take issue with this holding on two separate grounds: 1) that the district court changed the theory of the government, which originally regarded Local 560 as the section 1962(c) enterprise, and 2) that the court was clearly erroneous in finding that the Provenzano Group had continued vitality. We find no merit in either contention.
 
 
 119
 First, although the district court's analysis may have taken a somewhat different tack than that originally presented in the government's complaint, the district court correctly found that the defendants were on notice of this alternative theory and that it was fully litigated with the implied consent of the defendants. App. at 61 n. 15. Moreover, the complaint itself specifically charges that the Provenzano Group defendants "associated together in fact as an enterprise (the Provenzano Group) within the meaning of Section 1961 of Title 18 of the United States Code." App. at 188. The question of whether the Provenzano Group was an "enterprise" was therefore properly before the district court, and it was not prejudicial to the defendants for the court to base its holding in part on this finding.
 
 
 120
 The defendants further argue, however, that even if this theory was properly before the district court, the court's finding was irrelevant to the relief sought and granted with respect to Local 560; the only relevant question, argue defendants, was whether the individual Provenzano defendants conducted the affairs of Local 560 through a pattern of racketeering activity such as to justify the relief granted. Irrespective of the labels applied, however, the district court's findings amply supported a holding under section 1962(c).
 
 
 121
 Therefore, to the extent it may be deemed necessary to our holding, we reject the assertion that the district court was clearly erroneous in finding that the Provenzano Group is an ongoing enterprise within the meaning of section 1961(4). As noted below, ample evidence supported this factual conclusion. However, we find it unnecessary to rely on this finding, because the district court's findings of individual liability and vicarious liability for acts of co-conspirators fully support its ultimate holding that the individual Provenzano Group associates ("persons" within the meaning of RICO) violated both section 1962(b) and (c). Moreover, while it was not necessary for the district court to regard the Provenzano Group to be a formal "enterprise" under section 1961(4), the district court in so holding did not err, particularly since it concluded that the individual defendants are part of a continuing criminal association justifying the relief granted.
 
 
 122
 The district court, in reaching its conclusion, relied heavily on the testimony of Salvatore Sinno.[30] Sinno, an early associate of Anthony Provenzano and a member of the Provenzano Group, is one of only two Provenzano Group members to turn state's evidence. Sinno, who assisted in the murder of Anthony Castellitto, was one of the chief witnesses against Anthony Provenzano and others at the Castellitto murder trial.
 
 
 123
 Sinno testified at the instant trial about the formation of the Provenzano Group in the late 40's and that Group's niche within the Genovese crime family of New York--headed for a time by "Lucky" Luciano. According to Sinno, Anthony Provenzano was a "made member" ("button man" or "soldier") of the Genovese organization in addition to being the leader of the Provenzano Group. Members of the Provenzano Group in the early 1960s included Nunzio Provenzano, Sinno, and Salvatore Briguglio. Sinno stated that the Genovese family permitted the Provenzano Group during this time to participate in certain criminal activities (such as illegal gambling and labor racketeering) but prohibited the Group from engaging in other crimes (such as narcotics, prostitution, and counterfeiting).
 
 
 124
 Sinno's testimony indicates that, from the early 1940's to 1961 (when Sinno disassociated himself from the Provenzano Group), the Provenzano Group was a continuing criminal organization which was affiliated with an even larger criminal confederation.
 
 
 125
 The district court also regarded the many criminal convictions of Provenzano group members over the past thirty years--(convictions, which also represented RICO predicate acts for purposes of sections 1962(b) and (c))--as a strong indication that the Provenzano Group is still an ongoing criminal organization. These offenses, which include the Dorn labor peace payoffs, the Castellitto murder, the Seatrain labor peace payoffs, the Roman loan kickbacks, and the City-Man labor peace payoffs, see supra at 273-274,[31] all implicate the same core of individuals, and illustrate the insular nature of the Provenzano Group. The defendants maintain that these crimes do not represent evidence of an "enterprise" but rather should be regarded as "disparate events, spread over two decades, and involving numerous people." However, considering these crimes in conjunction with Sinno's testimony, as we observed earlier, we cannot say that the district court was clearly erroneous in finding that the Provenzano Group was an "enterprise" under section 1962(c), even though such a finding was unnecessary in light of the district court's contemporaneous finding that the Provenzano Group defendants were individually culpable under that section. We observe that the district court also took note of the fact that, over the 30 year history of the Provenzano Group, only two associates (Sinno and Picardo) have defected. To the district court, this indicated an impressive degree of "internal discipline, loyalty, and perserverance." App. at 105.[32]
 
 
 126
 Against this backdrop of continued criminal activity, it is difficult to accept the defendants' argument that the Provenzano Group is now defunct. The defendants point out that of the original Provenzano Group:
 
 
 127
 (1) Anthony Provenzano is now incarcerated for life. They also emphasized that Anthony Provenzano had also entered into a consent judgment in this case which effectively barred him from labor related activities.
 
 
 128
 (2) Salvatore Briguglio is dead.
 
 
 129
 (3) Nunzio Provenzano is currently serving a 10 year prison term, to be followed by a period of statutory disability. Nunzio Provenzano is a signatory to the same consent judgment which his brother, Anthony Provenzano, entered.
 
 
 130
 (4) Thomas Andretta is currently serving a 20 year prison term, and is a party to the consent judgment.
 
 
 131
 (5) Stephen Andretta, recently paroled from a prison term, cannot immediately hold union office as he is subject to the statutory disability period of the LMRDA.
 
 
 132
 (6) Gabriel Briguglio, currently on parole, is also subject to the statutory disability.
 
 
 133
 Nevertheless, the record clearly demonstrates that even incarceration, much less ineligibility to hold union office, does not prevent members of the Provenzano Group from committing acts of extortion. For example, during periods in which Anthony Provenzano was either incarcerated or subject to statutory disability, he sought and received his increased salary and pension payments, received the Romano Loan kickbacks,[33] and received his Seatrain labor peace payoffs. Indeed, the district court held that even during his terms of incarceration, Anthony Provenzano was able to influence Union activities.
 
 V.
 
 134
 Having held that the Provenzano Group was an "enterprise" for purposes of section 1962(c), the district court went on to hold that the Provenzano Group individual defendants violated that section by conducting or participating in the affairs of the Provenzano Group enterprise through a pattern of racketeering activity. App. at 146. Apart from their argument that the Provenzano Group is not an ongoing enterprise, see supra Part IV.B., the defendants do not dispute the district court's finding that the individual Provenzano Group defendants conducted the affairs of the Provenzano Group through a pattern of racketeering activity. As we have taken pains to point out, while this finding is supported by the record, and is not clearly erroneous, it nevertheless does not advance the RICO claim charged by the government. However, the district court did make individualized findings of guilt on the part of each Provenzano Group defendant. These findings fully support liability under the government's original theory--to wit, that the relevant "enterprise" was Local 560. However it structured its analysis, there is no question that the district court found, in substance, that the individual Provenzano Group defendants violated section 1962(c) by conducting the affairs of Local 560 through a pattern of racketeering--particularly in view of its related holding pursuant to section 1962(b). Further, it is not disputed that Local 560 is an enterprise under section 1961(4). Accordingly, we affirm the district court's finding that the Provenzano Group defendants violated section 1962(c).
 
 
 135
 The district court not only held that the Provenzano Group individuals[34] and the Executive Board members violated section 1962(b), see supra Part III, but it further found that both the Provenzano Group individuals and the Executive Board members conspired to violate 1962(b), in contravention of section 1962(d).[35] The district court held, in part, that section 1962(d) contained a state of mind requirement, separate and apart from the state of mind required for the commission of the predicate offenses, and that the Group and Board individual defendants satisfied the section 1962(d) state of mind requirement. App. at 139-140. Moreover, the district court held that under section 1962(d), the government need not demonstrate that the defendants performed an "overt act" (in addition to the two requisite RICO predicate offenses) in furtherance of the conspiracy. App. at 138. See also United States v. Barton, 647 F.2d 224 (2d Cir.), cert. denied, 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981). In this appeal, the defendants do not contest these conclusions. We therefore affirm the holding of the district court respecting the section 1962(d) conspiracy charges.
 
 VI.
 
 136
 The district court, to remedy the abuses of the Provenzano Group and the Executive Board, and to ensure that the Local 560 members will be able to exercise fully their democratic rights, ordered that the Executive Board be removed from office and replaced with a temporary trustee. The defendants argue that the district court had no power to remove the Executive Board or to establish a trusteeship. The government responds that such an equitable remedy was well within the discretion and power of the district court.
 
 
 137
 Section 1964(a)[36] of the RICO Act enables the district court, in its discretion, to employ a wide range of civil remedies. In relevant part, section 1964(a) empowers district courts to prevent violations of section 1962 "by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; [and] imposing reasonable restrictions on the future activities or investments of any person...." Clearly, the district court's injunction in the instant case fell within its broad remedial powers of "divestiture" and "reasonable restrictions" provided for under section 1964. Indeed, the House Report which accompanied the proposed RICO Act stated that
 
 
 138
 [Section 1964(a) ] contains broad provisions to allow for reform of corrupted organizations. Although certain remedies are set out, the list is not meant to be exhaustive, and the only limit on remedies is that they accomplish the aim set out of removing the corrupting influence and make due provision for the rights of innocent persons.
 
 
 139
 H.R.Rep. No. 91-1549, 91st Cong. 2nd Sess. 2, reprinted in 1970 U.S.Code Cong. & Ad.News 4007, 4034. Moreover, we take careful note of the Supreme Court's instruction in Sedima v. Imrex Co. Inc., supra,[37] regarding the interpretation of the RICO Act. The Court in Sedima held that:
 
 
 140
 RICO is to be read broadly. This is the lesson not only of Congress' self-consciously expansive language and overall approach, see United States v. Turkette, 452 U.S. 576, 586-87 [101 S.Ct. 2524, 2530, 69 L.Ed.2d 246] (1981), but also of its express admonition that RICO is to "be liberally construed to effectuate its remedial purposes," Pub.L. 91-452, Sec. 904(a), 84 Stat. 947.
 
 
 141
 105 S.Ct. at 3286.
 
 
 142
 The defendants, relying on United States v. Rubin, 559 F.2d 975 (5th Cir.1977), argue that removal of the Executive Board members was, in essence, a forfeiture, which can only be imposed under the criminal remedy provision of RICO-section 1963(a).[38] However, in Rubin, the court did not hold that the removal of union officers is impermissible under section 1964. Indeed, the court stated that under section 1964 (unlike section 1963) defendants may be enjoined from reacquiring union office. Logic dictates that if section 1964 grants the district court the authority to bar an individual from reacquiring office--it must also grant the district court the authority to remove an individual from office. Thus, in many ways, section 1964 is a more powerful provision than its criminal counterpart, section 1963. This is largely explained by the fact that, under section 1963, the forfeiture sanction attaches automatically, while under section 1964, the injunctive powers are left to the equitable discretion of the district court.[39]
 
 VII.
 
 143
 The order of the district court dated March 16, 1984 will be affirmed in all respects. The stay pending appeal ordered by the district court in paragraph 7[40] of its March 16, 1984 order is dissolved. The case will be remanded to the district court for further proceedings consistent with the foregoing opinion.
 
 
 
 [1]
 Although not named as defendants by the government, the district court held that other past and present members of the Provenzano Group included Harold Konigsberg, Armand Faugno, Frederick Furino, Salvatore Sinno, Ralph Picardo, and Andrew Reynolds. App. at 62
 
 
 [2]
 18 U.S.C. Sec. 1962(b) provides:
 It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.
 
 
 [3]
 18 U.S.C. Sec. 1962(c) provides:
 It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
 
 
 [4]
 18 U.S.C. Sec. 1962(d) provides:
 It shall be unlawful for any person to conspire to violate any of the provisions of subsection[s] (a), (b) or (c) of this section.
 
 
 [5]
 18 U.S.C. Sec. 2 provides: "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."
 
 
 [6]
 Since the Provenzano Group, aided and abetted by the Executive Board, extorted LMRDA rights of Local 560's membership for the purpose of "acquiring an interest in and control of" the Local 560 enterprise, the extortion of membership rights was properly designated as a section 1962(b) act
 The district court held, as well, that certain crimes committed by the Provenzano Group were predicate acts only for purposes of section 1962(c). For example, the district court noted that the Middlesex County Loansharking Transaction committed in March of 1967 by Thomas Andretta and Armand Faugno in violation of New Jersey law and the Skil Tool Theft committed in 1968 by Thomas Andretta and Frederick Salvatore Furino in violation of 18 U.S.C. Sec. 659, were racketeering activities relevant only to section 1962(c) of the RICO Act. App. at 76.
 
 
 [7]
 These articles were from the New York Daily News, the Hudson Dispatch, Life Magazine, the Newark Evening News, the New York Post, the New York Times, The Bergen Record, the Newark Star Ledger, the Wall Street Journal, and Time Magazine
 
 
 [8]
 The district court did not admit into evidence all of the articles submitted by the government. The district court, for example, disallowed articles that did not contain specific references to Local 560 or Provenzano Group members, and also excluded articles from Philadelphia papers on the basis that there was an insufficient number of Local 560 members who lived within the general circulation area of those papers
 
 
 [9]
 The government also argues that United States v. Blane, 375 F.2d 249 (6th Cir.), cert. denied, 389 U.S. 835, 88 S.Ct. 459, 19 L.Ed.2d 503 (1967) supports the district court's decision to admit the articles into evidence. However, we note that in Blane, the newspaper articles were not submitted into evidence, and were used only to cross-examine reputational witnesses
 
 
 [10]
 Wren obtained these names of members or former members of Local 560 mainly from the Department of Labor personnel who had been involved in the investigation of the Local 560 1962 election, and in supervising the 1965 election. All the individuals selected for interviews by Wren had been political opponents of the Provenzano Ticket in the 1960's
 
 
 [11]
 The government relies on language which appears in United States v. Lewin, 467 F.2d 1132, 1140 (7th Cir.1972) for the proposition that "[s]ystematic inquiry by a person coming from outside will often be a better source of knowledge than the casual opportunities of a neighbor or a friend." (quoting III Wigmore, Evidence Sec. 692 at 22 (Chadbourn rev. 1970). However, the text in Wigmore, although not quoted in Lewin, continues: "the only reason for distrust exists when the inquirer ... seeks evidence of one purport only." In the instant case, Wren sought evidence of only one purport
 
 
 [12]
 We agree with the district court that the appropriate burden of proof for the government in a civil action under the RICO Act (where remedies are sought pursuant to 18 U.S.C. Sec. 1964) is the "preponderance of the evidence" standard and not, as the defendants contend, the "beyond a reasonable doubt" or "clear and convincing evidence" standard. App. at 124-27. In holding that "preponderance" was the proper standard, the district court utilized the three-part balancing test articulated in Santosky v. Kramer, 455 U.S. 745, 754, 102 S.Ct. 1388, 1395, 71 L.Ed.2d 599 (1982)
 The Kramer Court, in determining whether a particular standard of proof in a particular proceeding satisfies due process, evaluated three factors: (1) the private interests affected by the proceeding; (2) the risk of error created by the state's chosen procedure; and (3) the countervailing government interest supporting use of the challenged procedure. In the instant case, the district court chose the "preponderance" standard in the instant case because (1) the defendants faced neither the prospect of criminal sanction nor the imposition of significant liberty deprivations and (2) the nature of the relief sought was equitable and remedial in nature, not punitive. In adopting the "preponderance" standard, the district court joined the majority of courts which have addressed this issue. See e.g. United States v. Cappetto, 502 F.2d 1351, 1358 (7th Cir.1974), cert. denied, 420 U.S. 925, 95 S.Ct. 1121, 43 L.Ed.2d 395 (1975); Farmers Bank of Delaware v. Bell Mortgage Corp., 452 F.Supp. 1278, 1280 (D.Del.1978); Heinold Commodities, Inc. v. McCarty, 513 F.Supp. 311, 313 (N.D.Ill.1979).
 Subsequent to the filing of the district court's opinion, the Supreme Court decided two cases which bear directly on this issue and which add further support for adopting the "preponderance" standard in civil actions brought under the RICO Act. In Herman & MacLean v. Huddleston, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983), the Supreme Court held that the normal civil standard of proof applies in civil fraud actions brought under section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. Sec. 78j(b). The language in Huddleston mandates the "preponderance" standard in all but a few civil cases. The Huddleston Court, in surveying this area of the law, stated:
 Thus, we have required proof by clear and convincing evidence where particularly important individual interests or rights are at stake. See, e.g., Santosky v. Kramer, 455 U.S. 745 [102 S.Ct. 1388, 71 L.Ed.2d 599], (1982) (proceeding to terminate parental rights); Addington v. Texas, supra (involuntary commitment proceeding); Woodby v. INS, 385 U.S. 276 (285-286) [87 S.Ct. 483, 487-88, 17 L.Ed.2d 362], (1966) (deportation). By contrast, imposition of even severe civil sanctions that do not implicate such interests has been permitted after proof by a preponderance of the evidence. See, e.g., United States v. Regan, 232 U.S. 37, 48-49 [34 S.Ct. 213, 217, 58 L.Ed. 494], (1914) (proof by a preponderance of the evidence suffices in civil suits involving proof of acts that expose a party to a criminal prosecution). Thus, in interpreting a statutory provision in Steadman v. SEC, supra, we upheld use of the preponderance standard in SEC administrative proceedings concerning alleged violations of the antifraud provisions. The sanctions imposed in the proceedings included an order permanently barring an individual from practicing his profession. And in SEC v. C.M. Joiner Leasing Corp., 320 U.S. at 355 [64 S.Ct. at 120 at 125 (1943)], we held that a preponderance of the evidence suffices to establish fraud under Sec. 17(a) of the 1933 Act.
 Id. at 389-90, 103 S.Ct. at 691.
 Even more on point is the Supreme Court's decision in Sedima v. Imrex Co., Inc. --- U.S. ----, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), where the Court held that proof of racketeering-type activity was not required to establish a RICO predicate act. Although the Court in Sedima did not reach the burden of proof issue, it nevertheless held:
 We are not at all convinced that the predicate acts must be established beyond a reasonable doubt in a proceeding under Sec. 1964(C). In a number of settings, conduct that can be punished as criminal only upon proof beyond a reasonable doubt will support civil sanctions under a preponderance standard. There is no indication that Congress sought to depart from this general principle here. That the offending conduct is described by reference to criminal statutes does not mean that its occurrence must be established by criminal standards or that the consequences of a finding of liability in a private civil action are identical to the consequences of a criminal conviction.
 
 
 [105]
 S.Ct. at 3282-83 (citations omitted)
 Reviewing the Supreme Court opinions in Santosky, Huddleston, and Sedima, we are satisfied that the preponderance standard applies in civil RICO litigation. While we recognize that the defendants in such actions have significant interests at stake (i.e., financial, occupational, and reputational), these interests are not sufficiently compelling to trigger a more stringent burden of proof.
 
 
 [13]
 The defendants argue that the Attorney General's jurisdiction under RICO in the instant case is pre-empted by sections 481-483 of the LMRDA, 29 U.S.C. Sec. 481-483. They maintain that, since the district court inferentially found that Local 560's elections since 1968 have been illegal, the Attorney General could not pursue a RICO claim because the LMRDA, 29 U.S.C. Secs. 481-483, provides the exclusive remedy by which an election can be set aside
 This argument has little merit. Contrary to the defendants' contention, the government initiated this suit, not to invalidate any particular election, but to eliminate entirely the union's racketeering element. The RICO Act and sections 481 through 483 of the LMRDA were designed to combat entirely different offenses, and as such, the LMRDA cannot be pre-emptive. Moreover, we note that RICO was enacted in 1970, eleven years after the LMRDA, and was intended, in part, to supplement the protections already afforded union members.
 
 
 [14]
 18 U.S.C. Sec. 1951(a) provides:
 Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.
 
 
 [15]
 In United States v. Cerilli, 603 F.2d 415, 424 (3d Cir.1979), cert. denied, 444 U.S. 1043, 100 S.Ct. 728, 62 L.Ed.2d 728 (1980), this Court held that, to satisfy the "affect on interstate commerce" requirement, all that need be shown is "proof of a reasonably probable effect on commerce, however minimal, as [a] result of the extortion." The defendants argue that there was no evidence that the extortion of union members' intangible property rights (LMRDA rights) had any affect on interstate commerce. We disagree
 Put simply, the actions of Local 560 affected interstate commerce because Local 560 entered into collective bargaining agreements with businesses directly engaged in interstate commerce. Thus, when membership rights to democratic participation in that union were extorted, the actions of Local 560 were affected, which, in turn, resulted in affecting interstate commerce through businesses involved in interstate commerce. Accordingly, the district court was not clearly erroneous in finding that the extortion of membership rights affected, in some minimal way, interstate commerce.
 
 
 [16]
 This Court's decision in United States v. Boffa, 688 F.2d 919 (3d Cir.1982), cert. denied, 460 U.S. 1022, 103 S.Ct. 1272, 75 L.Ed.2d 494 (1983), does not dictate otherwise. In Boffa, this court held that the RICO predicate act of mail fraud, 18 U.S.C. Sec. 1341, may encompass a scheme to deprive union members of the right to the "honest and faithful" services of union officials as provided in section 501 of the LMRDA, 29 U.S.C. Sec. 501, but may not encompass a scheme to deprive employees of rights created by section 7 of the NLRA, 29 U.S.C. Sec. 157. In Boffa, we rejected the argument that a violation of union rights under section 7 of the NLRA may be characterized as a RICO predicate act because of the "remedial nature of the [NLRA] and the primacy of the National Labor Relations Board in resolving unfair labor practice disputes." 688 F.2d at 927
 However, Boffa's conclusion with regard to section 7 of the NLRA is inapposite here since the NLRB does not have primary jurisdiction over the democratic rights created by section 411 of the LMRDA--the rights at issue in the present case. Under section 412 of the LMRDA, 29 U.S.C. Sec. 412, union members have a direct cause of action against the union and its officers for infringement of their section 411 rights.
 
 
 [17]
 Section 530 of the LMRDA provides:
 It shall be unlawful for any person through the use of force or violence, or threat of the use of force or violence, to restrain, coerce, or intimidate, or attempt to restrain, coerce, or intimidate any member of a labor organization for the purpose of interfering with or preventing the exercise of any right to which he is entitled under the provisions of this chapter. Any person who willfully violates this section shall be fined not more than $1,000 or imprisoned for not more than one year, or both.
 29 U.S.C. Sec. 530.
 
 
 [18]
 If the defendants' argument were to succeed, the government would have failed to prove that the Executive Board violated Sec. 1962(b) because, the defendants allege, Sec. 530, the preemptive section, is not a predicate act under RICO. See 18 U.S.C. Sec. 1961(1). In such a case, of course, the Executive Board could not have aided and abetted the Provenzano Group in a violation of the RICO Act
 As the text reveals, we decline to accept this argument. Rather, we hold that in the present context, the Hobbs Act is not displaced by Sec. 530, and hence, the Hobbs Act violations found by the district court satisfy the predicate act requirement of Sec. 1962(b).
 
 
 [19]
 At the time these appointments were made, 29 U.S.C. Sec. 504 barred individuals convicted of certain felonies from holding union office for a five year period. Section 504 of the LMRDA was amended in 1984 to, in part, extend the disability from five years to thirteen years
 
 
 [20]
 The defendants' argument that the Executive Board cannot be held culpable for the appointments so long as the appointments were in compliance with 29 U.S.C. Sec. 504, is misguided. Indeed, it was Congress' intent that the LMRDA should in no way limit the responsibilities which union officers have under other federal laws. 29 U.S.C. Sec. 523(a) provides, in relevant part, that "nothing in the [LMRDA] shall reduce or limit the responsibilities of any labor organization or any officer...."
 
 
 [21]
 We also find unpersuasive the defendants' contention that the Executive Board members were not aware of the criminal backgrounds of Luizzi or Reynolds at the time of their appointments. Both individuals had fairly extensive criminal histories and, in light of the entire record, the district court's finding that the Executive Board was aware of the criminal background of both individuals cannot be regarded as clearly erroneous
 
 
 [22]
 The district court found that the payments made to Anthony Provenzano were not in the interest of the union. The defendants argue that the district court should not have second-guessed the Local concerning a matter upon which the membership voted. We find this argument unpersuasive in light of the district court's findings of intimidation and fear leading to coerced judgments on the part of Local members
 
 
 [23]
 Under 29 U.S.C. Sec. 501(a), the officers of a union have an affirmative obligation to hold union money "solely for the benefit of the organization." The Executive Board's failure to take affirmative action to suspend these payments was circumstantial evidence that the Executive Board intended to aid the Provenzano Group
 
 
 [24]
 The district court also held that (1) the Executive Board's failure to remove both Salvatore Briguglio as business agent in December 1975 (after FBI agents recovered ammunition from his file cabinet during a search for guns at the union offices) and Nunzio Provenzano as President in May 1981 (after he was convicted in the City-Man case but before he was sentenced) and (2) the Executive Board's toleration of known and reputed criminals visiting union offices, also intensified the climate of intimidation in Local 560 and constituted separate Hobbs Act extortions. We agree that the purpose and effect of these actions was to extort the membership's rights through intimidation and fear. Moreover, we note that fear can be invoked in subtle and indirect ways. See e.g. United States v. Zito, 467 F.2d 1401, 1405 (2nd Cir.1972) (the mere mention of the name of a known criminal can instill fear)
 
 
 [25]
 We conclude that under RICO, an individual need not himself commit two requisite predicate offenses, as long as that same individual aids and abets the commission of the predicate offenses. Indeed, there is no authority to suggest that 18 U.S.C. Sec. 2(a) does not apply to RICO. Under 18 U.S.C. Sec. 2(a), whoever "aids, abets, counsels, commands, induces or procures [the commission of an offense against the United States] is punishable as a principal."
 
 
 [26]
 In Hirsch v. Enright, 751 F.2d 628, 633-34 (3d Cir.1984), this court held that for purposes of a single violation of Sec. 1962(b), the same entity cannot be both a "person" and an "enterprise." In so holding, Hirsch recognized that the district court in this case had not committed that error. Accordingly, Hirsch distinguished the Hirsch situation from the reasoning and holding of the district court in United States v. Local 560, 581 F.Supp. 279 (D.N.J.1984). See Hirsch, 751 F.2d at 634
 
 
 [27]
 The defendants do not dispute that Local 560 is properly an "enterprise" under 18 U.S.C. Sec. 1962(b)
 
 
 [28]
 The Supreme Court, subsequent to argument in the present appeal, affirmed the Seventh Circuit's opinion in Haroco, Inc. v. American National Bank and Trust Co., 747 F.2d 384 (7th Cir.1984), aff'd, --- U.S. ----, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985), without addressing the question of what constitutes a "person" for purposes of the RICO Act
 
 
 [29]
 As noted, the government argued that the Provenzano Group itself could be a person, Brief for Appellee at 37-38, and the district court so held. App. at 133. We cannot say that the district court's holding was in error, although in light of our discussion respecting the individual Provenzano Group defendants, we need not rely on that point
 
 
 [30]
 Contrary to the defendants' position, we find that Sinno's testimony was properly admissible against the current Executive Board members despite the fact that the current Executive Board members were not appointed until after 1961 (when Sinno left the Provenzano Group). The Executive Board members are bound by the prior acts and statements made by their co-conspirators, so long as the statements and acts were designed to further the conspiracy. United States v. Sarno, 456 F.2d 875, 878 (1st Cir.1972)
 
 
 [31]
 The defendants also argue that the district court relied on predicate acts of racketeering that were time-barred by the ten-year provision contained in section 1961(5) of the RICO Act. RICO prohibits a person from engaging in a "pattern of racketeering activity." 18 U.S.C. Sec. 1962(b). A "pattern of racketeering activity" under section 1961(5) of the RICO Act, requires "at least two acts of racketeering activity, one of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." The defendants maintain that this limitations period limits predicate acts to only those offenses which occurred ten years (plus time for incarceration) prior to the most recent predicate act (in the instant case, the extortion of membership rights in 1982). Under the defendants' theory, RICO provides for a ten-year (plus incarceration) maximum time period from the date of the most recent predicate act, in which to find all the other predicate acts. The defendants, therefore, would exclude many of the early predicate acts (such as the 1961 murder of Anthony Castellito)
 However, the plain language of section 1961(5) does not demand such a limited ten-year maximum time period for predicate acts. Of course, if there are only two (the minimum number) predicate acts, these acts must be within 10 years of each other. If there are more than two, however, the RICO Act does not require that they all fall within the same ten-year period. Rather, section 1961(5) requires only that the last predicate act occur within ten years (plus time for incarceration) of the commission of "a prior act." If the defendants' position were correct, then section 1961(5) would require the last predicate act to occur within ten years of the commission of "the most recent act ", rather than "a prior act." Even a cursory review of the extortionate acts found by the district court which impacted on the rights of Local 560's members (which occurred as recently as 1981 with respect to pension payments and appointments to union office) reveals the inherent flaw in the defendants' argument. See sections III A and B, supra. Accordingly, we conclude that the district court did not rely on time-barred predicate acts.
 The defendants also argue that the government's case should be barred under the laches doctrine. However, despite the fact that it is the defendants' burden to prove laches, see Minnesota Mining v. Berwick Industries, Inc., 532 F.2d 330, 334 (3d Cir.1976), they have made no showing, beyond a conclusory declaration, that (1) the government inexcusably delayed in bringing this civil RICO action, and (2) the defendants were prejudiced by the delay. See Churma v. United States Steel Corp., 514 F.2d 589, 593 (3d Cir.1975). We therefore reject this argument as well.
 
 
 [32]
 The district court also found that the deposition of Andrew Reynolds demonstrated the "continued vitality and viability of the Provenzano Group." App. at 66. On August 17, 1982, Andrew Reynolds, then a Business Agent for Local 560, was deposed. At this deposition, Reynolds invoked his Fifth Amendment privilege in refusing to answer, among other things, (1) whether he knew Matthew Ianniello (an alleged member of the Genovese Crime Family); (2) whether Ianniello and the Genovese Family control Local 560 through Reynolds and others, and (3) whether he knew Funzi Tieri (a reputed organized crime figure). At trial, the district court, after admitting Reynold's deposition into evidence, drew an adverse inference from Reynold's invocation of the Fifth Amendment. See Baxter v. Palmigiano, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976), finding that Reynolds was a member of the Provenzano Group. App. at 62
 We find, however, that, even assuming Reynold's testimony was properly admitted into evidence, it was inappropriate for the district court to have drawn an adverse inference from Reynold's failure to respond. In Baxter, the Supreme Court held that in a civil case the finder of fact may draw an adverse inference from a party's invocation of his Fifth Amendment right against self-incrimination. The Court recognized, however, that there must be sufficient independent evidence--besides the mere invocation of the privilege--upon which to base the negative inference. See also National Acceptance Co. of America v. Bathalter, 705 F.2d 924 (7th Cir.1983).
 In the instant case, we find that there is not a sufficient evidentiary foundation which can support the district court's negative inference. The district court based its inference solely on the fact that (1) Reynolds was observed meeting with Nunzio Provenzano and Bobby Manna and with Nunzio Provenzano and Matthew Ianniello and (2) Reynolds was appointed as a Business Agent by the Local 560 Executive Board. These facts, without more, cannot support the district court's inference. We note as well that there exists no testimony which, directly or indirectly, links Reynolds with the other members of the Provenzano Group. On such a record, we believe that the district court erred in finding Reynolds to be a member of the Provenzano Group and thus inferring the continued vitality of the Provenzano Group from Reynold's invocation of his constitutionally guaranteed privilege. At the same time, however, we find that the district court's conclusion that the Provenzano Group is an ongoing and viable organization is sufficiently supported by Sinno's testimony and the evidence of criminal convictions. Thus, while the district court erred in drawing an inference from Reynold's testimony, that error was harmless in light of the independent evidence supporting the district court's conclusion. See DeLaval Turbine, Inc. v. West India Industries, Inc., 502 F.2d 259 (3d Cir.1974), discussed in text, supra, at 278.
 
 
 [33]
 The district court found that Anthony Provenzano received kickbacks from Thomas Romano in exchange for helping Romano receive certain real estate loans. The kickbacks took the form of the below-market sale of two houses in Florida by Romano and his associates to Anthony Provenzano. The district court found that the first house, sold on November 1, 1974, was sold for $22,000 under market value, and the second house, sold on July 7, 1977, was undervalued $42,500. App. at 78-81
 At trial, both sides presented expert witnesses to testify as to the market value of the two houses in question at the time of the sale. The defendants argue that the district court's finding is clearly erroneous because, in reaching it, the district court relied entirely on the government's expert witness and discounted the testimony of the defendants' expert. Our reading of the record reveals, however, that the district court did not adopt wholesale the testimony of the government's expert witness. With regard to the first transaction the district court held: "Eliminating certain contested aspects of each appraiser's report, and averaging the remaining minor differences I find that the approximate value of 531 Palm Drive on the purchase date as $174,000 [the sales price was $152,000]. App. at 80. Respecting the second purchase, the district court concluded: "Again using the most credible portion of both appraisers' reports, I find that this property was in fact worth $222,500 at that time, a 'benefit' for Anthony Provenzano of 42,500." Id.
 Moreover, we note that even if the district court decided to discount entirely the credibility of the defendants' appraiser, such a credibility decision, except under extreme circumstances, should not be disturbed on review by an appellate court. See Anderson v. City of Bessemer, --- U.S. ----, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).
 
 
 [34]
 See supra discussion at 288-289
 
 
 [35]
 See supra n. 4 for the text of 18 U.S.C. Sec. 1962(d)
 Although the district court, in the concluding paragraph of its opinion, stated that "the individual defendants herein have violated 18 U.S.C. Sec. 1962(b), (c), and (d)," app. at 154, the district court clearly did not intend to hold that each defendant violated Secs. 1962(b), (c), and (d). As we previously observed, the Provenzano Group defendants were found by the district court to have violated section 1962(b), (c), and (d), having violated 1962(d) by conspiring to violate both section 1962(b) and 1962(c). App. at 6-7. However, the district court did not find that the Executive Board defendants violated Sec. 1962(c), or conspired to violate that section under Sec. 1962(d). Nor did the government make such allegations. App. at 174. Rather, the government alleged, and the district court found, that the Executive Board defendants violated Sec. 1962(b), and conspired to violate Sec. 1962(b), in contravention of Sec. 1962(d). App. at 148, 174-75, 185. Thus, the district court's March 16, 1984 order reciting that the Executive Board members violated Secs. 1962(b), (c), and (d), App. at 157, misstated the record with respect to the Sec. 1962(c) violation.
 
 
 [36]
 18 U.S.C. Sec. 1964(a), the civil remedies provision of RICO, provides:
 The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons.
 
 
 [37]
 Recognizing that the Supreme Court had pending before it two civil RICO cases which potentially bore on issues present in these appeals, we withheld our disposition of this case until after the Supreme Court filed Sedima v. Imrex Co., Inc., --- U.S. ----, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) and Haroco, Inc. v. American National Bank and Trust Co., --- U.S. ----, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985). As previously noted, supra at n. 27, supra, the Supreme Court affirmed the Seventh Circuit's Haroco decision, holding that a claim under Sec. 1962(c) requires only that the plaintiff suffer damages from the predicate acts themselves, and not from the fact that the acts were performed as part of the conduct of an enterprise. In Sedima, the Supreme Court reversed the Second Circuit, holding that a plaintiff need not prove a "racketeering injury" in order to maintain a claim under Sec. 1962(c)
 We asked counsel to submit supplementary memoranda commenting on the impact, if any, of Sedima and Haroco on the issues presented here. Throughout this opinion we have discussed relevant aspects of both Sedima and Haroco as they affect particular issues in this appeal.
 38 U.S.C. Sec. 1963(a) provides:
 Whoever violates any provision of section 1962 of this chapter shall be fined not more than $25,000 or imprisoned not more than twenty years, or both, and shall forfeit to the United States (1) any interest he has acquired or maintained in violation of section 1962, and (2) any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which he has established, operated, controlled, conducted, or participated in the conduct of, in violation of section 1962.
 
 
 [39]
 Finally, the defendants argue that, by appointing a trustee to be in charge of Local 560, the district court forced the membership, which had not violated the RICO Act, to forfeit its interest in the union. Defendants maintain that it is impermissible to punish a party under section 1964(a) if that party has not been found to have violated the Act
 The membership of Local 560, however, is not being punished by the district court's injunction. The district court concluded, and, by this opinion, we have affirmed that conclusion, that the membership no longer controls the union. By appointing a temporary trustee, the district court was therefore protecting rather than forfeiting the members' rights. Moreover, as we have observed, the power to appoint a Trustee falls within the broad equitable powers granted to district courts under section 1964(a). See generally, Lewis v. Kugler, 446 F.2d 1343, 1351 n. 18 (3rd Cir.1971).
 
 
 [40]
 Paragraph 7 of the district court's March 16, 1984 order reads:
 
 
 [7]
 That the effect of the injunctive relief ordered herein, together with the naming of the trustee(s), is stayed pending appeal