UNITED STATES of America, Plaintiff,

v.

LOCAL 560 (I.B.T.), Nominal
Defendant–Intervenor,

and

Michael Sciarra, Defendant.

Civ. A. No. 82–689.

United States District Court,
D. New Jersey.

Jan. 7, 1991.

As Corrected Jan. 11, 1991.

Michael Chertoff, U.S. Atty., Robert C. Stewart, Asst. U.S. Atty., Chief Strike Force Div., Colette R. Buchanan and Jerome L. Merin, Asst. U.S. Attys., Newark, N.J., for plaintiff.

Peter V. Ryan, West Orange, N.J., for defendant Michael Sciarra.

Michael Critchley, West Orange, N.J., for defendant Nominal defendant-intervenor Local 560 (I.B.T.).

Paul Montalbano, Schneider, Cohen, Solomon, Leder & Montalbano, Cranford, N.J., for Local 560.

## OPINION

DEBEVOISE, District Judge.

In this proceeding the government seeks a permanent injunction against Michael Sciarra prohibiting him from further participation in the affairs of Local 560.[1] The trial was conducted on July 16, 1990, but only two witnesses were presented, and the bulk of the evidence upon which a decision must be based was introduced upon applications for preliminary injunctive relief. Fed.R.Civ.P. 65(a)(2). This opinion constitutes my findings of fact and conclusions of law.

### A. PROCEDURAL BACKGROUND

This case is an outgrowth of, and now a part of, an action which the government commenced on March 9, 1982 pursuant to 18 U.S.C. § 1964, the Racketeering Influenced and Corrupt Organizations Act ("RICO Act")). Asserting that Local 560 of the International Brotherhood of Teamsters was being victimized by racketeering activity, the complaint sought injunctive relief against individual defendants Anthony Provenzano, Nunzio Provenzano, Thomas Andretta, Stephen Andretta and Gabriel Briguglio, as associates of the so-called "Provenzano Group." The complaint also sought injunctive relief against the Local 560 Executive Board incumbents, Salvatore Provenzano, Joseph Sheridan, Josephine Provenzano, J.W. Dildine, Thomas Reynolds, Sr., Michael Sciarra and Stanley Jaronko.

On February 8, 1984, after lengthy hearings, the Honorable Harold A. Ackerman issued an opinion, *United States v. Local 560, Intern. Bro. of Teamsters*, 581 F.Supp. 279 (D.N.J.1984), holding that the

---

**1.** Initially, the government sought the same relief against Joseph Sheridan, but prior to the trial Sheridan and the government entered into a consent decree and no further relief is sought against him.

Provenzano Group, through racketeering activity, had dominated and exploited Local 560 for more than a quarter of a century. Judge Ackerman issued a Judgment Order on March 16, 1984 in which the court: (a) enjoined Stephen Andretta and Gabriel Briguglio from having any future dealings with and from endeavoring to influence the affairs of Local 560 or any other labor organization or employee benefit plan; (b) removed from office temporarily the remaining incumbent Executive Board members (including Sciarra) and (c) imposed a trusteeship upon Local 560 for such period of time as might be necessary to eliminate the racketeer influence within Local 560 and to restore democratic processes within the Union. Prior to trial, Anthony Provenzano, Nunzio Provenzano and Thomas Andretta entered into consent decrees barring them forever from participating in, or otherwise interfering with, the affairs of Local 560 or any other "labor organization" or "employee benefit plan."

Judge Ackerman stayed his March 16, 1984 Judgment Order pending appeal. In consequence Sciarra and the other members of the Executive Board of Local 560 remained in office.

On December 26, 1985 the Court of Appeals for the Third Circuit affirmed the judgment of the district court, 780 F.2d 267, and on May 27, 1986 the Supreme Court denied a petition for certiorari, 476 U.S. 1140, 106 S.Ct. 2247, 90 L.Ed.2d 693. On June 23, 1986 Judge Ackerman lifted the stay and implemented the Trusteeship provided for in the Judgment Order. Thus, there was a period of approximately two years, four and one-half months between Judge Ackerman's February 1984 opinion detailing the racketeering activity and the 1986 appointment of the trustee and ouster of the Executive Board. During that period, on October 19, 1984 to be precise, Sciarra succeeded Salvatore Provenzano (who had been convicted of defrauding the welfare benefit fund and of receiving kickbacks) as President of Local 560. What transpired during that period is one of the principal subjects of the present proceeding.

Judge Ackerman appointed Joel Jacobson Trustee of Local 560 on June 23, 1986. On May 12, 1987 Judge Ackerman appointed Edwin H. Stier, Esq., in place of Jacobson, and he appointed as Associate Trustee Frank Jackiewicz. Stier undertook numerous measures to achieve his three principal objectives: (a) conducting the day-to-day operations of the union so as to provide effective representation to the membership, (b) using his own background in conducting investigations to organize and oversee inquiries into the affairs of the union and of the pension and welfare funds, and (c) encouraging the members of Local 560 to throw off years of passivity in the face of Provenzano domination and to participate in the affairs of the union.

In early 1988 Stier concluded that although the forces conducive to an uncoerced atmosphere within Local 560 were still fragile and still threatened with organized crime efforts to regain control, an election with suitable controls was feasible.

On February 11, 1988 Judge Ackerman extended the Trusteeship until December 6, 1988 and ordered that general elections be held prior to that date. Nominations were to be made at a membership meeting called for October 9, 1988 and the election by secret ballot was scheduled for November, ballots to be mailed to each member's home to reduce the opportunities for undue pressure.

Certain developments came to the attention of the government which led it to believe that unless injunctive relief were obtained, the result of the election would be to return Local 560 to the control of organized crime, specifically the Genovese Family. The strongest faction competing for control of Local 560 was Teamsters for Liberty, a group which had never evidenced a critical view of the former leadership and which was dedicated to termination of the Trusteeship. That stance of itself was no reason to interfere with the efforts of Teamsters for Liberty. However, the government had come into possession of evidence which led it to believe that the Genovese Family had determined to regain control of Local 560 and that it had desig-

nated Michael Sciarra as the Person through whom it would exercise control. Sciarra was a dominant force in Teamsters for Liberty, and he and Joseph Sheridan, also a former Executive Board member when the Provenzano Group was in control, were Teamsters for Liberty's candidates for President and Vice–President, respectively.

Faced with that situation and with the fragile nature of Local 560's democratic forces the Government instituted the present proceedings, seeking an order prohibiting Sciarra and Sheridan from further participation in the affairs of Local 560.

The government filed an Application for Additional Relief and obtained an order to show cause in the original Local 560 case. Sciarra and Sheridan raised a procedural barrier, namely that they were no longer parties to the original action and that therefore relief could not be sought against them by way of order to show cause. In light of this procedural question the government served upon Sciarra and Sheridan a complaint embodying the same allegations and requests for relief as were contained in the order to show cause application.

I treated the government's application as a request to amend or supplement the complaint pursuant to Fed.R.Civ.P. 15(a) and (b). The relief requested was an order preliminarily enjoining Sciarra and Sheridan from any further participation in and from otherwise endeavoring to influence the affairs of Local 560. By way of ultimate relief the government sought a permanent injunction containing the same prohibition.

On September 14, 1988, after a six-day hearing, I granted preliminary injunctive relief, barring Sciarra and Sheridan from seeking elective office. *United States v. Local 560 (I.B.T.)*, 694 F.Supp. 1158 (D.N.J. 1988), *aff'd*, 865 F.2d 253 (3d Cir.1988), *cert. denied*, 489 U.S. 1068, 109 S.Ct. 1345, 103 L.Ed.2d 814 (1989). Teamsters for Liberty substituted as its candidates for President and Vice–President Sciarra's brother Daniel Sciarra and Sheridan's nephew Mark Sheridan.

The election was carefully monitored and fairly conducted, and on December 6, 1988 it was announced that the Teamsters for Liberty slate had won. As a result Daniel Sciarra and Mark Sheridan assumed the offices for which they ran. Other Teamsters for Liberty candidates had been elected to complete the Executive Board. Stier, the Trustee, turned over the day-to-day administration of Local 560 to the newly elected officers and Executive Board but continued to serve in a monitoring role.

On January 9, 1989 the newly elected Board appointed both Michael Sciarra and Joseph Sheridan to fill business agent positions. Thereupon the government obtained an order to show cause why they should not be immediately barred from holding any appointed position within Local 560 pending the outcome of the trial in the matter. The government urged that Sciarra and Sheridan gave the appearance of acting as *de facto* officers of the Local and of exercising actual power consistent with that of incumbent Executive Board members, thus creating the risk of reemergence of Genovese Family control of the Union.

At a hearing on January 30, 1989 I concluded that the development was troubling but that I should not assume without more that the new officers and Executive Board would not exercise full control of the Union or that they would be subject to Sciarra's domination and influence. Consequently I denied the government's application at that time.

The Trustee, pursuant to orders of Judge Ackerman, continued to monitor closely the management of the Union. The new officers and Executive Board members entered upon their duties. Subsequently, Sheridan entered into a settlement with the government, resigning as business agent and agreeing not to involve himself in the future in the management of Local 560. Michael Sciarra, however, remained highly involved in the Union's affairs.

On February 6, 1990 the government moved once again to bar Sciarra from holding any position of trust in the Union, asserting that evidence relating to events during the previous 13 months showed that

Sciarra had used his hold on a large and vocal segment of the Local 560 membership and his position as business agent to acquire control of the Union. A second preliminary injunction hearing was held on March 20 and 21, and I concluded that Sciarra had indeed become virtually *de facto* President of Local 560. On May 8, 1990 I signed an order preliminarily enjoining Sciarra from holding any position of trust within Local 560 and from attempting to influence its affairs.

I scheduled a trial on an expedited basis. The trial began on July 16, 1990. Relying upon the entire prior record in the litigation, the government presented one additional witness. Prior to the trial Sciarra submitted a list of approximately 70 witnesses he expected to call at trial. However, when the time came only he testified. Thus, this matter must be decided upon the facts established at the trial before Judge Ackerman as set forth in his February 8, 1984 opinion and upon the additional evidence presented at the two preliminary injunction hearings and at the trial of the amended and supplemental complaint which seeks relief against Sciarra.

### B. THE FACTS

It must be emphasized at the outset that the present proceeding against Sciarra is not a new action. It is a part of the larger action which was and is still pending before Judge Ackerman. Many of the facts which are relevant to this proceeding seeking relief against Sciarra were established during the lengthy trial before Judge Ackerman. These facts are set forth in the comprehensive opinion reported at 581 F.Supp. 279. That opinion will be referred to as *"Local 560* No. 1."

Certain of the factual findings recited in *Local 560* No. 1 bear repetition.

As previously stated, there were two categories of defendants at the time the original action was instituted. There were those individuals who were members of the Provenzano Group. They included its leader Anthony Provenzano and also Nunzio Provenzano, Stephen Andretta, Thomas Andretta and Gabriel Briguglio. At various times there were other members of the Provenzano Group who were either dead when the 1982 action was initiated or who for other reasons were not named as defendants. The other group of defendants consisted of the 1982 Executive Board members Salvatore Provenzano, Sheridan, Josephine Provenzano, Dildine, Reynolds, Sciarra and Jaranko, who were found to have aided and abetted the Provenzano Group when it unlawfully acquired and maintained control of Local 560 through a pattern of racketeering activity in violation of § 1962(b) of the RICO Act.

The Provenzano Group was a subgroup of a larger New York-based criminal organization once headed by Vito Genovese and commonly known as the Genovese Family. The Genovese Family had a settled hierarchy of boss, underboss, captains and soldiers. Anthony Provenzano was a "made member" within the larger family and was, in effect, franchised to engage in a variety of criminal activities such as gambling, extortion, trafficking in stolen property and the corruption of law enforcement authorities to ignore criminal violations. *Local 560* No. 1 at 305.

Matthew Ianniello was a captain or capo-regime in the Genovese Family. He was a friend of Anthony Provenzano and an acquaintance of one-time Executive Board members Salvatore and Josephine Provenzano. *Local 560* No. 1 at 305, 306.

As Judge Ackerman found, "[d]uring the past thirty years, Anthony Provenzano and other members of the Provenzano Group have engaged in a pattern of criminal and other improper acts, the object of which was to gain control over and to exploit the Local 560 Enterprise." *Local 560* No. 1 at 306. His opinion set forth the details of a multitude of actions which the Provenzano Group took to maintain control of the Union and to utilize that control to achieve its criminal ends such as—(i) extortion of payments for labor peace, (ii) intimidation of Union members to control elections, (iii) murdering and assaulting opponents in the Union, (iv) rewarding perpetrators of criminal acts with payments and union positions, (v) voting union payments and pensions to

Anthony Provenzano while he was in prison, (vi) recovering kickbacks and fees for influencing decisions relating to Local 560 benefit, welfare and pension plans, (vii) corruptly using enormous amounts of pension and welfare funds for the Provenzano Group's own benefit, resulting in great losses to those funds, (viii) using "actual and threatened force, violence and fear of physical and economic harm, particularly the loss of the ability to earn a livelihood—to induce or coerce the membership into surrendering their federally-protected rights to participate in the affairs of Local 560 in a democratic manner," (ix) systematically appointing and reappointing associates of the Provenzano Group, particularly those with criminal records and a propensity to violence to important positions within the Union, and (x) permitting known and reputed criminals to frequent Local 560's offices. *Local 560* No. 1 at 306–316.

None of this, of course, could have taken place without the knowledge and participation of the Local 560 leadership.

Sciarra was appointed a Local 560 business agent in July 1972, holding that position until 1976. He was reappointed in 1977 and became a trustee in 1981. He testified at the original trial that Anthony Provenzano was his idol and that he would welcome back Anthony and Nunzio Provenzano and Stephen Andretta even if the charges against them were true. Even if it were true that Anthony Provenzano had ordered the murder of Anthony Castellitto, Sciarra testified that he would pray for the return of Anthony Provenzano. Instances of Sciarra's conduct during, and attitude about, the events of the Provenzano years are set forth in *Local 560* No. 1 at 302–303, 325.

■ Aiding and abetting, within the meaning of 18 U.S.C. § 2 is complicity with or facilitation of the criminal conduct of another. In order to convict a defendant of aiding and abetting the commission of a crime the government must prove (i) that the substantive crime has been committed, (ii) that the defendant charged with aiding and abetting that crime knows of the commission of the substantive offense and (iii)

that such defendant acted with intent to facilitate the substantive offense.

Judge Ackerman concluded that the members of the Provenzano Group unlawfully conducted and participated in an enterprise (the Provenzano Group) through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1962(c) and 2; that the members of the Provenzano Group unlawfully acquired and maintained an interest in and control of the Local 560 enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1962(b) and 2; and that the members of the Provenzano Group conspired to violate both sections 1962(b) and 1962(c) in violation of 18 U.S.C. § 1962(d).

Further Judge Ackerman found that "during their respective periods of incumbency [the Executive Board members, including Sciarra] did aid, abet and facilitate the commission of the § 1962(b) violations. This complicity was exhibited through their appointment and retention in office of certain officials of Local 560 and in their discharge of certain other duties, the collective impact of which has, in particular, directly and substantially contributed to the existence of the climate of intimidation within the Local." *Local 560* No. 1 at 335.

The Third Circuit in its opinion affirming Judge Ackerman, speaking in terms of conspiracy rather than aiding and abetting, succinctly summarized the legal conclusions derived from the evidence at the original trial.

"... the *Provenzano Group defendants* were found by the district court to have violated section 1962(b), (c), and (d), having violated section 1962(d) by conspiring to violate both section 1962(b) and 1962(c).... and the district court found, that the *Executive Board defendants* violated § 1962(b), and conspired to violate § 1962(b), in contravention of § 1962(d)." 780 F.2d at 294.

Judge Ackerman concluded that the captivity of Local 560 could be terminated and the restoration of democratic control restored only if the defendants who were members of the Provenzano Group were enjoined from any future contacts with Lo-

cal 560 and if the Executive Board were removed. Thus, as described above, after all appeals were exhausted, injunctive relief was granted and a trustee appointed.

On three occasions in the last two years I have held evidentiary hearings concerning Sciarra's continuing role in Local 560. My findings upon the conclusion of the first application for a preliminary injunction are set forth in 694 F.Supp. 1158 (*Local 560* No. 2); my findings upon conclusion of the second application for a preliminary injunction are set forth in 736 F.Supp. 601 (*Local 560* No. 3). The evidence which was submitted at the trial of the matter consisted of the testimony of Special Agent Mark Dowd of the Federal Bureau of Investigation, the testimony of Michael Sciarra and certain documents. Nothing that developed at the trial leads me to alter the findings set forth in *Local 560* No. 2 or *Local 560* No. 3. In fact the evidence at the trial fortifies those findings.

The totality of the evidence establishes that: (i) Since March 16, 1984 when Judge Ackerman signed the order granting relief the Genovese Family has sought to maintain or reestablish its control over Local 560; (ii) Michael Sciarra was the person through whom the Genovese Family sought to effectuate its control; (iii) Sciarra accepted this role; (iv) Sciarra has a dominating and forceful personality, and there are no leaders or factions within Local 560 who are able to resist him and the forces within the Union which he controls; and (v) unless Sciarra is removed from any position within Local 560 he will assume control of the Union, directly or indirectly, and thereby subjugate Local 560 once again to the control of the Genovese organized crime family.

■ The continuing determination of the Genovese Family to maintain control of Local 560 is evidenced by the tape recordings of three conversations held in a construction shed in Edgewater, New Jersey and by one tape recording of a conversation held at the Palma Boy Social Club in East Harlem. When viewed in conjunction with the findings in *Local 560* No. 1, they demonstrate that the efforts of this organized crime group to control Local 560 did not cease with the entry of Judge Ackerman's order. The personnel changed somewhat, but many old faces continued to appear.

I quoted extensively from those tape recordings in my opinion in *Local 560* No. 2, at pp. 1170–1178. I incorporate my earlier findings with respect to the tapes herein and at this point will only summarize them.

The first conversation took place on November 1, 1984 and involved Milton Parness, Matthew Ianniello (a captain in the Genovese Family), Stanley Jaronko (who served on Local 560's Executive Board with Sciarra) and an unidentified male. Ianniello and Jaronko discussed continued control of Local 560. Jaronko stated that he would "just lay low for eighteen months" (the period during which it was expected a court-appointed trustee would be in office). It was in that conversation that Ianniello directed Jaronko to "let Mike run the show." The reference was to "Mikey Sciarra."

The second tape records a November 6, 1984 conversation between Ianniello and Stephen Andretta (one of the defendants who was a member of the Provenzano Group). It was a lengthy conversation concerning numerous persons in the Genovese Family, past and pending criminal endeavors, and the Local 560 RICO case. As to the situation at Local 560, Ianniello stated, "I think Mike Sciarra should take over there. Who can you trust there, anybody else?" Andretta responded, "Mike and I were born and raised together." Later Ianniello stated, "I'll send word to [Mike]. I'll make sure that he knows that you can talk to him as one." There followed this interchange:

*Ianniello:* No, no, I'll send word to Mike (unintelligible).

*Andretta:* I can see Mike any time you want me to.

*Ianniello:* You?

*Andretta:* Yeah.

The third tape records a December 7, 1984 conversation between Ianniello, Stephen Andretta and an unidentified male.

That too was a lengthy conversation which dealt with a number of subjects of significance in this case, one of the more important subjects being the New England Motor Freight ("NEMF") contract. As to the role which Sciarra was to play, the following is illustrative:

*Andretta:* I understand at this point. But with Mikey and then you, you have direct control of Mikey.

*Ianniello:* Yeah.

*Andretta:* No question.

*Ianniello:* Yeah, he does what I tell him.

A fourth tape recorded conversation had taken place on November 28, 1984 in the Palma Boy Social Club in New York City. The participants were then Genovese Family boss Anthony Salerno, Louis Gatto, one of his caporegimes, Giuseppe Sabato and Cirino Salerno. The conversation turned to Local 560, and the following exchange took place:

*A. Salerno:* But they threw everybody out of office there.

*Sabato:* Yeah, they're all out.

*A. Salerno:* Everybody's out.

*Sabato:* They're all out.

*A. Salerno:* So how can you control it?

*Sabato:* What do you mean? They got the control in there.

*A. Salerno:* Who is that now?

*Sabato:* Matty (Ianniello).

*A. Salerno:* Oh, we got a guy in there?

*Sabato:* Sure

These taped conversations must be viewed in the light of the facts disclosed in the 1984 *Local 560* No. 1 opinion. When so viewed there can be no doubt that the Genovese Organized Crime Family intended to maintain its control over Local 560 during the pendency of the appeal from Judge Ackerman's March 16, 1984 Judgment Order, during any period of trusteeship and thereafter. I concluded after the first preliminary injunction hearing and I conclude now that the tapes constitute strong evidence that this control was to be exercised through Anthony Salerno's caporegime Matthew Ianniello and that Ianniello, upon the advice of Stephen Andretta, selected Michael Sciarra to be the man on the scene at Local 560 to whom orders and instructions could be given.

Thus, notwithstanding the issuance of the March 16, 1984 Judgment Order and the appointment of a trustee on June 23, 1986 the Provenzano Group as it existed in 1984 and as its personnel changed somewhat during the years that followed, never ceased the unlawful conduct described in Judge Ackerman's opinion in *Local 560* No. 1.

Sciarra, in his post trial brief seeks to escape the damning implication of these tape recorded conversations by urging that they are not admissible against him. At the time of the 1988 preliminary injunction hearing I admitted the tapes relying on Fed.R.Evid. 801(d)(2)(E)—statements by a co-conspirator of a party during the course and in furtherance of the conspiracy. *Local 560* No. 1 at 1188. That ruling was affirmed on appeal. Sciarra now urges that Judge Ackerman had found that he was an aider and abettor and not a co-conspirator and therefore this exception to the hearsay rule is inapplicable.

I note that the Third Circuit in the opinion affirming *Local 560* No. 1 stated that Judge Ackerman had found that the Executive Board members not only violated 18 U.S.C. § 1962(b) but also *"conspired* to violate § 1962(b), in contravention of § 1962(d)." 780 F.2d at 294, fn. 35. The Third Circuit approved evidential use of statements of members of the Provenzano Group against Executive Board members, including Sciarra, relying on the co-conspirator hearsay exception. For example, the Third Circuit opinion stated "[c]ontrary to defendants' position, we find that Sinno's testimony was properly admissible against the current Executive Board members despite the fact that the current Executive Board members were not appointed until after 1961 (when Sinno left the Provenzano Group). The Executive Board members are bound by the prior acts and statements made by their co-conspirators, so long as the statements and acts were designed to further the conspiracy." 780 F.2d at 291, fn. 30.

Thus, for evidential purposes, Sciarra was treated by Judge Ackerman and by the Third Circuit as a co-conspirator. There was every reason to do so, and there is every reason to continue to do so if the evidence before me shows that he continued to aid and abet or conspire with the Group within the Genovese Family seeking to perpetuate its control over Local 560. I conclude that the evidence demonstrates continued aiding and abetting and conspiracy.

■ Sciarra erroneously argues in his post-trial brief that to succeed the government must prove a new RICO offense based on conduct which occurred after the March 16, 1984 Judgment Order. This argument misconceives the nature of the present proceeding.

This is not a new case, beginning with a clean slate. Rather, it is but a facet of the original case commenced on March 9, 1982 and which (other than this proceeding) is still continuing before Judge Ackerman. This proceeding is designed to determine whether, by reason of events which took place after the March 16, 1984 Judgment Order, additional equitable relief should be granted against Sciarra.

Thus, the inquiry whether Sciarra has aided and abetted the post March 16, 1984 efforts to gain control of Local 560 starts with his past conduct. As recited above for thirty years prior to 1984 the Provenzano Group had engaged in a pattern of criminal and other improper acts to gain control over and to exploit Local 560. Sciarra became a business agent of Local 560 in 1972 and became a trustee in 1981, all the time idolizing the head of the Provenzano Group, Anthony Provenzano. Sciarra and the other members of the Executive Board knew that these crimes and other improper acts had been committed and he and the other members of the Executive Board acted with the intent to facilitate those crimes and other improper acts. All this must be considered in evaluating Sciarra's post March 16, 1984 conduct.

■ After March 16, 1984 Sciarra continued to profess his loyalty to Anthony Provenzano and could not bring himself to disavow the criminal and other unlawful tactics of the Provenzano Group nor to admit the existence of the Provenzano Group conspiracy and Genovese Family involvement in the affairs of Local 560. As recently as September 24, 1989, Sciarra, then a Local 560 business agent, proclaimed to an enthusiastic Local 560 membership his love for Provenzano. I do not take seriously Sciarra's belated mea culpa delivered on July 17, 1990 at the conclusion of the trial in this matter. That declaration, like so many of Sciarra's statements over the years, was designed to meet his needs of the moment.

Most of the evidence in this case was introduced at the 1988 preliminary injunction hearing. That evidence disclosed actions on Sciarra's past which tied him personally to the taped conversations and the continuing conspiracy. Neither Sciarra's testimony at the trial nor the arguments advanced in his post-trial briefs lead me to change the findings and conclusions with respect to these actions set forth in my 1988 opinion, *Local 560* No. 2. I incorporate those findings and conclusions herein.

The evidence and findings with respect to the New England Motor Freight ("NEMF") sweetheart arrangements are set forth at 694 F.Supp. at 1173–1177, 1179–1181.

It was established that for many years NEMF had an extraordinarily favorable arrangement with Local 560 in that only 13 of its 123–133 warehousemen and drivers were Local 560 members, the rest being either non-union owner-operators or employees of another corporation who were members of a different union having less favorable terms and conditions of employment than those enjoyed by Local 560 members. The December 7, 1984 tape disclosed that when Salvatore Provenzano was president of Local 560 he applied various pressures upon NEMF to terminate the favorable arrangement. The tape also discloses that Ianniello and Andretta were fearful that the legal proceedings which arose out of the Local 560–NEMF dispute posed a threat to persons associated with them and they wanted the dispute with NEMF ended. Sciarra had replaced Salva-

tore Provenzano (after the latter's criminal conviction) as President of Local 560 on October 29, 1984. In the December 7, 1984 conversation Ianniello and Andretta decided that Sciarra was to make peace ("square it") with NEMF:

*Ianniello:* You know what I think?

*Andretta:* What?

*Ianniello:* Michael's business. Let's let Michael try to square it. (unintelligible).

*Andretta:* Sammy [Provenzano], but Sammy got shoved out of the office. He's gotta step down, he kept pushing the guy. Instead of letting him go, nobody gets in trouble.

*Ianniello:* Yeah, I wanted to do it.

*Andretta:* He came to tell Mikey last month (unintelligible). He says don't let up on the fucking guy. Crucify and bury him. I said no you gonna get five guys locked up with the mother fucker.

*Ianniello:* Don't do it. Tell Mikey not to do it.

I concluded that after the December 7, 1984 Andretta–Ianniello conversation Sciarra took steps designed to square it with NEMF, acting in accordance with Ianniello's and Andretta's instructions. On January 31, 1985 Sciarra sent to NEMF's attorney a proposed contract consisting of two and one-half pages. The grave deficiencies of this contract from Local 560's perspective are described in *Local 560* No. 2, 694 F.Supp. at 1179. There was testimony at the 1988 hearing by NEMF's attorney and by Local 560's attorney concerning this proposed contract. Sciarra testified at the trial concerning it, seeking to show that it was part of a bona fide effort on his part to increase Local 560's membership among NEMF employees. The testimony of the attorneys was not convincing in 1988, 694 F.Supp. at 1179–1180 and Sciarra's testimony was not convincing in 1990. More telling as to the legitimacy of the January 31, 1985 contract proposal is the fact that at the February 14, 1988 Local 560 meeting Sciarra vehemently (and falsely) denied that he had sent such a contract to NEMF. The totality of the evidence supports a finding that Sciarra went through the motions of seeking NEMF recognition of Local 560 as bargaining agent for all its employees but in actuality simply permitted perpetuation of the status quo at NEMF.

Another series of events which is evidence that Sciarra was implementing the wishes of Ianniello and Andretta is the shifting testimony of Daniel Rubino, who was the business agent who had dealt with NEMF when the arrangements favorable to NEMF and unfavorable to Local 560 had been in effect. The December 7, 1984 taped conversation disclosed that when Salvatore Provenzano was putting the heat on NEMF he also pressured Rubino concerning his testimony in the NEMF grievance proceedings dealing with the dispute. Rubino was close to being eligible for a pension and did not wish to antagonize Provenzano.

Rubino testified in the grievance proceedings twice while Salvatore Provenzano was President of Local 560 and once after Sciarra became President. As I found after the 1988 hearing, the Rubino testimony given during the Provenzano incumbency was conspicuously different from his testimony given after Sciarra became President. On the former occasions he initially denied knowing about the past practices claimed by NEMF. During the course of the questioning on those two occasions he later grudgingly admitted knowledge of certain facts which would constitute those past practices. However, at the February 25, 1985 hearing after Sciarra had become President, Rubino was far more forthcoming, declaring without hesitation his knowledge of the details of the past practices. For further details of this testimony see *Local 560* No. 2, 694 F.Supp. at 1180–1181. These circumstances tend to confirm that Sciarra was implementing Ianniello's and Andretta's instructions.

I cited two other circumstances in my 1988 opinion which tended to confirm Sciarra's continued participation in the Genovese Family efforts to maintain control over Local 560.

The first was the failure to take steps to remove Marvin Zalk as administrator of the Local 560 Welfare Plans after he had been convicted of obstruction of justice in a case

involving fraud upon the Plans. The second was the failure to terminate a contract with a provider of legal services to Local 560 members under circumstances so egregious as to defy belief. I incorporate the detailed findings about each of these circumstances set forth in *Local 560* No. 2, 694 F.Supp. at 1181–1183.

At the 1988 hearing Local 560 attorney Edward A. Cohen, Esq. attempted to rationalize these failures to act. In his trial testimony Sciarra sought to justify his conduct, stating that he relied on advice of counsel, that he was only one of a number of trustees, etc. At the 1988 hearing I found, and I continue to find, that Mr. Cohen's reasons for Sciarra's failures to take action were absurd. During the period from January 12, 1989 until May 8, 1990, when Sciarra was nominally only a Local 560 business agent under the supervision of the Executive Board, he demonstrated his ability to exercise complete control over the Union, whatever his title. *See Local 560* No. 3, 736 F.Supp. at 606–610. There can be no doubt that had Sciarra wished to have Zalk and the legal services provider removed during the period of his Presidency, a mere whisper from him would have accomplished that removal. His failure to take that action is corroborative of his continued participation in the Genovese Family conspiracy to maintain control of Local 560 in violation of RICO.

Since the 1988 hearing additional evidence confirms this conclusion. It will be recalled that after I enjoined Sciarra and Sheridan from running for the offices of President and Vice–President in the December 1988 election, Sciarra's brother Daniel Sciarra was nominated and elected President and Sheridan's nephew Mark Sheridan was nominated and elected Vice–President. Considering the inexperience of each of those persons it required an act of faith to believe that they would function independently of Michael Sciarra. One's faith was further tested when virtually the first act of the new Executive Board was to appoint Michael Sciarra a business agent of Local 560.

I probably should have granted the government's application to enjoin Michael Sciarra from assuming the position of business agent, but perhaps it is fortunate that I did not do so. Permitting Sciarra to serve as business agent during the January 12, 1989 to May 8, 1990 period when he was supposedly under the control of the Executive Board, provided a demonstration of what would happen if he were given any position within Local 560. He immediately became de facto President of the Union, pushing his brother aside, figuratively and literally, whenever it suited his purpose to do so. Were it not for the continuing intervention of the court appointed Trustee he would have had himself appointed a trustee of two pension and welfare funds maintained for the benefit of Local 560 members. These funds had been grossly misused during the Provenzano years, and one of the principal tasks of the court appointed trustee was to ensure their honest and effective administration.

I incorporate herein by reference my findings concerning Sciarra's assumption of power in Local 560 during the period when he was nominally business agent. *Local 560* No. 3, 736 F.Supp. at 604–612.

One episode during the business agent period illustrated Sciarra's continuing hostility to outside monitoring of the pension and welfare funds. On November 1, 1989 Thomas G. Hynes, a special agent with the United States Department of Labor, met with the executive director of the Local 560 funds, Michael Santonello. Without knocking, Michael Sciarra along with Mark Sheridan entered the room where Hynes and Santonello were meeting. Ignoring Hynes, Sciarra engaged Santonello in a five minute conversation, at the conclusion of which he stated that he wished to attend the next fund board meeting. Shortly afterwards as Hynes waited at the elevator to leave Sciarra approached him, asked who he was and in particular if he were with the government. Sciarra gently pushed Hynes in the chest stating "get out of here." Hynes testified, "I got the message he wanted me out of the building."

I issued the 1988 order enjoining Sciarra from becoming President of Local 560 because were he to assume that office there was a strong likelihood that he would lead Local 560 back into the control of the Genovese Organized Crime Family. The evidence submitted at the 1990 second preliminary injunction hearing showed that Sciarra through his position as business agent, had assumed the power which the first preliminary injunction was intended to keep from him. Therefore on May 8, 1990 I issued a new order preliminarily enjoining Sciarra from holding any office in Local 560.

At the trial of this matter two additional items of evidence further demonstrated Sciarra's continuing ties to the Genovese Family. It will be recalled that Matthew Ianniello and Stephen Andretta were the principal participants in the tape recorded conversations which established the Genovese Family's continuing plan to control Local 560 and the decision to use Sciarra as the person through whom control would be exercised.

At the trial Special Agent Mark Dowd of the F.B.I. testified that on the morning of June 4, 1990 (less than a month after I had enjoined Sciarra from participating in Local 560 affairs) he and Special Agent Thomas Browne conducted a physical surveillance of Sciarra. This led them to a diner on Route 46 near Little Falls. When the two agents entered, Sciarra was using the pay telephone in the vestibule. They proceeded by him to a booth just inside the dining area. About ten minutes later Sciarra entered this area from the vestibule and walked across the room to two men who occupied a table. The Agent identified one of these men, who was seated in the courtroom, as Local 560 business agent David Keitt. Sciarra conversed with the two men for some minutes. At that point, a fourth individual entered the dining area. Sciarra immediately left Keitt and his companion and walked back towards the entrance where the other man had paused. They exchanged greetings and sat down together at the first booth inside the dining area. Agent Dowd identified this man as Stephen Andretta. After approximately twenty-five minutes, the agents left the diner and waited outside. Keitt and his companion left the diner moments after the two agents. Approximately forty-five minutes thereafter, Michael Sciarra and Stephen Andretta left the diner together. They conversed in the parking lot for a few more minutes, and then departed from the area in their respective vehicles.

The other item of evidence showing Sciarra's continuing association with the Genovese Family was elicited on cross-examination of Sciarra. The Government asked about Jimmy Ida, who had been identified during the August, 1988 proceedings as "Matty" Ianniello's chauffeur and as one of his designated messengers to Michael Sciarra on Local 560 matters. In the monitored conversation of December 7, 1984 Ianniello had told Andretta that Ida could serve as a contact with Sciarra if Andretta were having difficulty with the assignment. On cross-examination Sciarra admitted that he had met with Ida on some seven occasions since 1987 in a cafe in Manhattan's "Little Italy" Section.

Sciarra's explanation of the meetings with Andretta and with Ida was that there was a need to discuss Sciarra's being a defense witness in an upcoming criminal trial at which Andretta and Ida would be defendants. I have little confidence in Sciarra's explanations of events and circumstances generally. At the very least this evidence shows Sciarra's continuing association with the Genovese Family members who devised the plan to exercise control of Local 560 through him.

The evidence at the trial of this case does nothing to change the factual findings resulting from the 1988 and 1990 preliminary injunction hearings. Rather the trial evidence fortifies and provides additional support for those findings. The findings can be summarized as follows.

In 1984 Judge Ackerman found (i) that the Provenzano Group, a component of the Genovese Organized Crime Family, unlawfully conducted and participated in an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1962(c)

and 2; (ii) that the members of the Provenzano Group unlawfully acquired and maintained an interest in and control of Local 560 through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1962(b) and 2; (iii) that the members of the Provenzano Group conspired to violate both sections 1962(b) and 1962(c) in violation of 18 U.S.C. § 1962(d); and (iv) that during their respective periods of incumbency the Local 560 Executive Board members, including Sciarra, aided, abetted and facilitated the commission of the section 1962(b) violations.

After Judge Ackerman's March 16, 1984 Judgment Order the Genovese Family, without interruption, continued to seek to acquire and maintain an interest in and control of Local 560 for criminal purposes. The Genovese Family, acting through Matthew Ianniello and Stephen Andretta, designated Sciarra as the person through whom control of Local 560 would be exercised.

Sciarra aided and abetted the Genovese Family acting through the Provenzano Group in its criminal activities regarding Local 560 prior to March 16, 1984 and thereafter Sciarra continued to aid and abet the Genovese Family as it sought to perpetuate its interest in and control over Local 560.

As long as Sciarra holds any position within Local 560 he will be able through his forceful personality and through his hold on a large and vocal segment of the membership to dominate and control the Local and its pension and welfare funds. If he assumes power within the Union it is highly likely that upon termination of the court appointed trustee's oversight the Genovese Family would reassert control over Local 560, undoing all the efforts of the past eight years. Great strides towards the establishment of union democracy have been made during the period of the trusteeship. The return of Sciarra and, through him, Genovese Family influence, would crush the movement towards membership control and bring back the dark night of the strong arm and repression.

Control by Sciarra and through him by the Genovese Family would place the welfare and pension funds at great risk. They were looted before the court appointed trustee assumed office and if Genovese Family influence were reestablished it is almost a foregone conclusion that they would be looted again upon the departure of the Trustee.

In sum, Sciarra's presence within Local 560 would subject the union, its members and its pension and welfare funds to irreparable injury. This injury can be avoided only by injunctive relief which would prevent Sciarra's return to any leadership capacity in Local 560.

## C. CONCLUSIONS OF LAW

Most of the legal issues raised in this proceeding have already been decided by the Third Circuit in its opinion affirming Judge Ackerman's March 16, 1984 Judgment Order, *United States v. Local 560*, 780 F.2d 267 (3d Cir.1985). I need address these issues no further.

The 1982–84 phase of the action resulted in a RICO adjudication against Sciarra. This was based on his involvement as a member of the pre–1982 Executive Board whose collective gross misconduct aided and abetted the Provenzano Group with respect to the continuing extortion of the union members' LMRDA rights (18 U.S.C. § 1951) and the resulting pattern of racketeering activity in violation of 18 U.S.C. §§ 1962(b) and (d). In his March 1984 Judgment Order, implemented in June 1986 after all appeals had been completed, Judge Ackerman removed from office temporarily the remaining incumbent Executive Board members (including Sciarra).

The present phase of the action, based not only upon the pre–1984 events but also upon events which transpired after March 1984, projects the question whether the relief awarded in the 1984 Judgment order against Michael Sciarra was adequate. As recited above I have concluded that additional relief is necessary to prevent irreparable injury to the Union, its members and the Union's pension and welfare funds. The additional relief required is a perma-

nent injunction prohibiting Sciarra from holding any position of trust within or otherwise endeavoring to influence the affairs of Local 560 or any of its benefit plans.

■ Sciarra urges that a permanent injunction would deny him his Fifth Amendment rights to liberty and property by preventing him from pursuing his means of livelihood as an officer, Executive Board member or business agent of Local 560. Throughout his adult life Sciarra has been a member or employee of Local 560, from which he has derived his income and upon which he and his family have depended for a livelihood and support.

The Third Circuit has ruled that "[s]ection 1964(a) of the RICO Act enables the district court, in its discretion, to employ a wide range of civil remedies. In relevant part, section 1964(a) empowers district courts to prevent violations of section 1962 'by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; [and] imposing reasonable restrictions on the future activities or investments of any person ...'" 780 F.2d at 295. Further, the Third Circuit referred to the case of *United States v. Rubin,* 559 F.2d 975 (5th Cir.1977) and noted with approval that the Fifth Circuit had "stated that under section 1964 (unlike section 1963) defendants may be enjoined from *reacquiring* union office." The Third Circuit then observed that "[l]ogic dictates that if section 1964 grants the district court the authority to bar an individual from *reacquiring* office—it must also grant the district court the authority to remove an individual from office." 780 F.2d at 296.

Although the Third Circuit addressed an order which only temporarily removed the Executive Board members from office, the language and the logic of its opinion would permit a district court to enjoin a defendant such as Sciarra from reacquiring union office. The statute permits such relief and there is no constitutional impediment to granting such relief.

■ The only question, therefore, is whether a permanent injunction against Sciarra is a *reasonable* restriction within the meaning of section 1964(a). I have concluded that it is both reasonable and necessary.

It is necessary for the reasons I have elaborated in my factual findings. It is reasonable that the injunction be permanent rather than remaining in effect for only a designated number of years.

Sciarra has opportunities for work other than employment as an officer, Executive Board member or business agent of Local 560. He is at that stage in life where he has acquired pension interests based upon his employment by Local 560. The preliminary injunction decree issued after the second preliminary injunction hearing was tailored so as to enable him to become eligible for payment of pension benefits. Thus, any hardship upon Sciarra and his family has been minimized.

Sciarra also argues that a lesser remedy should be decreed, namely an order which would permit him to continue as a business agent and which would impose tight restrictions on what he could and could not do. That suggestion has some appeal. However, we have already tried that approach and, as described above, it was a dismal failure. I refer to my opinion in *Local 560* No. 3 for the details of that failure.

For all the foregoing reasons I conclude that additional relief is required. An order will be entered permanently enjoining Michael Sciarra from holding any office or position of trust within or otherwise endeavoring to influence the affairs of Local 560 or any of its benefit plans. The government is requested to submit a form of order.